**Roy WILBUR, Plaintiff–Appellant,**

v.

**Charles L. MAHAN, Defendant–Appellee.**

No. 92–3379.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 1993.

Decided Aug. 23, 1993.

Jeffrey B. Rock (argued), Hasselberg & Rock, Peoria, IL, for plaintiff-appellant.

Edward T. Graham, Jr. (argued), Hershey, Beavers, Periard & Graham, Frank B. Schweitzer, Taylorville, IL, for defendant-appellee.

Before CUMMINGS, POSNER, and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

This case arises at the intersection of two lines of free-speech decisions. One concerns the right of public officials to hire or fire an employee on the basis of his affiliation with a political party or faction. The other concerns their right to discipline an employee who speaks out on a matter of public significance in a way displeasing to them. Sheriff Mahan of Christian County, Illinois, decided to run for reelection in the November 1990 election. In August 1989 Deputy Sheriff Wilbur announced his candidacy for the office of sheriff. He declared that if elected he would delegate more authority to the deputy sheriffs; Mahan, according to Wilbur, ran the office as a one-man band. Both Mahan and Wilbur are Democrats. About a week after Wilbur announced his candidacy, Mahan amended the regulations of the sheriff's office to provide that any employee who ran for sheriff could be placed on unpaid leave of absence until the election. The regulation, effective September 1, 1989, was made applicable to Wilbur on December 16, almost a year before the election. He claims without contradiction that because the deputy's job was his only source of income his ability to campaign was crippled by the application of the new regulation to him; he must not have been able to raise substantial campaign contributions. He claims again without contradiction that between the time he declared his candidacy and the time he was forced to go on unpaid leave he did not discuss politics or campaign during hours when he was on duty and his candidacy and campaigning did not disturb the operations of the office in the slightest. We assume that Wilbur lost the election and returned to his deputy's job, although the record is curiously silent on these points. His suit, brought under 42 U.S.C. § 1983, seeks among other things to recover the wages that he lost as a result of his unpaid leave of absence.

The district judge granted summary judgment for the defendant. Yet at first blush the facts we have recited present a blatant case of retaliation for the exercise of the right of free speech. Wilbur was critical of how a public official, the sheriff, was performing his job. The sheriff punished Wilbur by taking away his salary. Given the state of the record, severely incomplete as it well may be, we must assume that the new regulation, empowering the sheriff to remove a deputy or other employee of his office who runs for election as sheriff, was aimed at deterring Wilbur from running, crippling his campaign by reducing his income, punishing him for his effrontery in running against the sheriff, and silencing or muting his criticisms of that official—criticisms that constituted the message of Wilbur's campaign. The right to criticize public officials is at the heart of the First Amendment's right of free speech, *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and punishments far less severe than taking away the critic's income have been held to infringe the right. *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982). A subordinate of a public official is, moreover, ideally situated to be an effective critic of the official. Being an insider, the subordinate acquires knowledge about the intimate operation of the office at far lower cost than an outsider could do.

Mahan has as yet made no effort to show that Wilbur's candidacy and campaign interfered with the efficient operation of the sheriff's office or would have done so had Wilbur remained in his deputy sheriff's job throughout the campaign.

 There was a time when by virtue of accepting public employment an individual surrendered his right of free speech. "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman." *McAullife v. Mayor & Board of Aldermen*, 155 Mass. 216, 29 N.E. 517 (1892) (Holmes, J.). That time is long past. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972); *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). It is true that public employees do not have as broad a right of free speech as they would if they were merely critics and not also employees of government. (1) A public employee disciplined for making a statement that is not a public comment on issues of public significance has no remedy under the First Amendment. *Connick v. Myers*, 461 U.S. 138, 146, 149, 103 S.Ct. 1684, 1689–90, 1691, 75 L.Ed.2d 708 (1983); see also *Rankin v. McPherson*, 483 U.S. 378, 384, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987). (2) An employee's statement that would be protected if made by a person not employed by the public agency is not privileged if it is likely to disrupt the efficient operation of the agency. *Id.* at 384, 107 S.Ct. at 2897; *Connick v. Myers, supra*, 461 U.S. at 149–51, 103 S.Ct. at 1691–92; *Pickering v. Board of Education, supra*, 391 U.S. at 568, 88 S.Ct. at 1734. (3) States can adopt counterparts to the federal Hatch Act, *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), which requires a civil servant who wants to run for office to resign from the civil service. 5 U.S.C. § 7324(a)(2). The first limitation is not involved in this case, however. As for the second, the defendant has presented, as we have said, no evidence of actual or probable disruption. As for the third, the defendant does not rely on the "baby Hatch Act" cases, perhaps because Illinois does not have a baby Hatch Act. He could we suppose argue that his own regulation empowering him to place any employee who runs for sheriff on unpaid leave of absence is itself a baby Hatch Act, entitled to the same deference as a state statute would be, since ordinarily the federal courts do not concern themselves with the level within state government at which an action claimed to violate the federal Constitution originates. *Falls v. Town of Dyer*, 875 F.2d 146, 147 (7th Cir. 1989); *Menora v. Illinois High School Ass'n*, 683 F.2d 1030, 1036 (7th Cir.1982); *DeMallory v. Cullen*, 855 F.2d 442, 453–54 (7th Cir. 1988) (dissenting opinion). He does not make the argument, perhaps because it would be rather a stretch of the Hatch Act cases to interpret them as authorizing a public official selectively to apply a "resign to run" provision to his political enemies. The regulation at issue is permissive, not mandatory. No doubt it would always be invoked by a sheriff who planned to run for reelection; but he might not be planning to run, and in that event might invoke the regulation only against a deputy of whose views he disapproved.

In granting summary judgment for Mahan, the district judge relied primarily on decisions that limit, also in the name of the First Amendment, the right of government officials to base personnel decisions on party affiliation. *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion), 367, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547; *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Soderbeck v. Burnett County*, 752 F.2d 285, 288 (7th Cir.1985). It may seem paradoxical that decisions which *limit* the powers of government should be invoked in defense against a suit claiming an infringement of free speech. But those decisions contain an exception for the situation in which the public employee or job applicant occupies or seeks an office having a confidential character (as in the case of a personal secretary or personal assistant, for example), a policymaking function, or some other characteristic that would make party affiliation a reasonable job qualification. *Elrod v. Burns, supra*, 427 U.S. at 367, 96 S.Ct. at 2687; *Branti v. Finkel, supra*, 445 U.S. at 518, 100 S.Ct. at 1294–95; *Upton v. Thompson*, 930 F.2d 1209, 1213–16 (7th Cir.1991); *Tomczak*

*v. City of Chicago,* 765 F.2d 633, 640 (7th Cir.1985); *Soderbeck v. Burnett County, supra,* 752 F.2d at 288; *Livas v. Petka,* 711 F.2d 798, 800 (7th Cir.1983). A public agency would be unmanageable if its head had to appoint or retain his political enemies, or if that is too strong members of the opposite party—or for that matter members of no party, neither enemies nor friends—in positions of confidence or positions in which they would be making policy or, what amounts to the same thing, exercising discretion in the implementation of policy. He could not trust the occupants of the confidential positions to keep his secrets or the occupants of the policymaking positions to carry out his policies with fidelity and diligence.

*Upton v. Thompson, supra,* holds that deputy sheriffs in Illinois are policymakers within the meaning of these decisions because they exercise significant discretion (more than that of an ordinary policeman) in the performance of their duties. From this the district judge inferred that once a public employee is put into the confidential-assistant or policymaker slot, he loses his right of free speech. That may have been too big a leap. The decisions in which the confidential-assistant and policymaker exceptions were created and have been applied involved (or were assumed to involve or treated as involving) situations in which the employee was complaining that he had lost or had failed to get a job because he was not a member of the employer's political party. They are cases about patronage hiring—about the spoils system. The exceptions we have sketched reflect a recognition that some patronage hiring may be essential to democratic government: elected officials cannot implement the policies that they were elected to carry out, and hence the will of the electorate cannot be effectuated, unless the officials can install their political allies in the most sensitive jobs. The effect on free speech is recognized—political independence is compromised if party affiliation is a condition for getting or keeping a job—but it is small, because most civil servants are apolitical, and it is deemed outweighed by the interest in securing effective democratic government.

The present case is not a patronage case. Wilbur was not placed on unpaid leave because he belongs to the "wrong" political party or the wrong faction of the right party. He belongs to the same party as the sheriff, and there is no suggestion of factions beyond what is implicit in Wilbur's decision to campaign against a fellow Democrat (it may have been a faction of one). The defendant claims the right to fire a confidential or policymaking employee on *any* ground. Interpreted literally, that is a questionable position, though not one on which we are required to rule in this case. The status of being a confidential or policymaking employee exposes a public employee to being fired for belonging to the wrong party. It does not expose him to being fired for belonging to the wrong race, or the wrong church. It may not—though this is a more difficult question—expose him to being fired for engaging in forms of expression that have no conceivable bearing on his job. Suppose Wilbur belonged to the animal rights movement and contributed money to efforts to ban hunting, and Mahan was an enthusiastic hunter and fired Wilbur to express his contempt for animal rights. Maybe even then Mahan could make an argument that Wilbur's activities were inimical to the discipline of the office. But if he made no such argument, we would have some difficulty understanding why, just because Wilbur was a policymaking employee, Mahan could invoke the patronage line of cases to curtail Wilbur's freedom of expression on a matter not only remote from the purview of his duties but, we are assuming, utterly incapable of interfering with the operation of the sheriff's office. The patronage cases do not deal with such a situation, and they do not hold that an individual surrenders *all* his freedom of speech by becoming a confidential or policymaking employee of government.

All this said, we think the district judge was right to dismiss the suit. The specific facts here, which are remote from those of our animal rights hypothetical, bring Wilbur within the scope of the concern that gave rise to the exceptions in the patronage cases. That concern, which cannot be confined to matters of party affiliation, is with the effects on the operations of government

of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies. That concern is activated when an employee who occupies such a job announces that he is going to run against his boss for the boss's office because the boss is not administering the office properly. The declaration of candidacy in these circumstances is a declaration of war. It makes the candidate a political enemy of his boss whether or not they are members of the same party—some of the bitterest political fights are intraparty fights; consider Senator Edward Kennedy's campaign to supplant President Carter as the Democratic Party's 1980 Presidential candidate, or Patrick Buchanan's campaign to supplant President Bush as the Republican Party's 1992 Presidential candidate. If as here the candidate occupies a confidential or policymaking position under the boss, the political enmity that the candidacy is certain to engender entitles the boss to fire him. Actual disruption or disturbance need not be proved. Such proofs are not required in the patronage cases. Once the employee is classified as confidential or policymaking, he can be fired on political grounds even if there is no evidence that he would not serve his political superiors loyally and competently.

If a public official is permitted to fire a confidential or policymaking employee merely because the latter quietly, inoffensively, undemonstratively belongs to the wrong political party—or even merely because he is a political eunuch, belonging to no party, taking no political stance—the official should be permitted to fire the same employee when the latter asks the electorate to throw the rascal out and put himself into the rascal's office. The restriction on free speech may be greater than in the patronage cases because the employee is an active speaker, and in the patronage cases the employee is penalized less often for what he said than for his party affiliation or nonaffiliation; rarely is he an active speaker. At the same time, the disruptive potential of an employee's candidacy in opposition to his boss is much greater than that of an employee who, merely by virtue of a different party affiliation, may not be trusted to serve the boss with the maximum of fidelity and zeal.

It is different when the employee who is running against or otherwise speaking against his superior is not a confidential or policymaking employee. He is not entrusted with the superior's confidences or with discretionary authority. His disloyalty does not create the appearance or reality of undermining the superior's authority. But in this case we are dealing with a policymaking employee, and we do not think that as soon as a case is shifted from the gravitational field of the patronage cases to that of the public employee speech cases such short cuts as presuming that a policymaking employee's electoral challenge is inconsistent with the effective operation of democratic government must go by the board and the employer must prove, as a matter of fact, a "compelling governmental interest." Wilbur's lawyer opined in answer to a hypothetical question from the bench that if the Secretary of Health and Human Services announced that she would run for President against President Clinton in 1996 because she disapproved of his policies, the President could not, consistent with the First Amendment, fire her without proving that the announcement would intolerably disrupt the effective functioning of his Administration. If he did fire her and she sued, he would not be entitled to summary judgment. There would have to be, in the lawyer's words, an "open-ended inquiry" at trial, at which the interest of the President in being able to assure the personal and political loyalty of his Cabinet officers would have to be balanced against their interest in being able to speak their minds on matters of public concern and campaign for public office. We do not agree. Legal proofs are not the only source of knowledge and decision. Categorical judgments based on experience and common sense play an important role in all areas of law. The exception recognized in the patronage cases for sensitive employees rests on such judgments and it retains its force in cases that have nothing directly to do with patronage or party affiliation. An elected official is entitled to insist on the loyalty of his policymaking subordinates, and a declaration that the subordinate means to run against the official at the next election is

the height of disloyalty. It would be a strange rule that gave more job protection to policymaking employees who vociferously attack their superiors than to policymaking employees who do their best to serve those superiors faithfully but have the misfortune to belong to the wrong party. It would give policymaking employees and other sensitive employees an incentive to attack their bosses in order to retain their jobs.

We are mindful that *Thomas v. Carpenter,* 881 F.2d 828 (9th Cir.1989), held that a suit by a lieutenant in the sheriff's office who like Wilbur was punished for campaigning against the incumbent sheriff stated a claim. But unlike deputy sheriffs in Illinois (according to *Upton v. Thompson* ) he did not exercise a policymaking function, see *id.* at 829, and the court was sympathetic to the proposition that the governmental interests identified in the *Elrod–Branti* line of cases are relevant when, as in our case, a policymaking employee complains of retaliation or discrimination for having campaigned against his superior. *Id.* at 831. We are mindful, too, that *Stough v. Gallagher,* 967 F.2d 1523, 1527–28 (11th Cir.1992), says that the *Elrod* and *Pickering* lines of cases cannot be combined— that if the subordinate was fired because of what he said rather than because of his party affiliation the fact that he was a confidential or policymaking employee is irrelevant. We disagree, of course, but we have no quarrel with the holding of *Stough.* The plaintiff and the defendant in that case were captains in the sheriff's office. Captains were career officers, not policymakers; they could be fired or demoted only for cause. The sheriff's office was vacant and the defendant a candidate for it. The plaintiff supported another candidate. The defendant won, and demoted the plaintiff. The plaintiff had not run against his boss—the defendant hadn't been his boss. And he was not a policymaking or confidential employee. See *id.* at 1529. He was not within the orbit of the *Elrod* principle at all. *Terry v. Cook,* 866 F.2d 373, 376–77 (11th Cir.1989), contains similar dicta about keeping the two lines of case separate, but it was a pure *Elrod* case, not a hybrid like ours in which a (1) policymaker is fired for (2) speaking out.

Although the sheriff's regulation challenged in this case is limited neither to confidential and policymaking employees nor to elections in which the sheriff himself is a candidate, the plaintiff does not complain that the regulation is overbroad or argue that he is entitled to assert the interest of an employee who might be deterred by the broad scope of the regulation from engaging in protected activity. *Gooding v. Wilson,* 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Waldron v. McAtee,* 723 F.2d 1348, 1353 (7th Cir.1983).

The judgment of the district court dismissing Mr. Wilbur's suit is

AFFIRMED.

EASTERBROOK, Circuit Judge, concurring.

My colleagues treat a simple case governed by settled doctrine as if it were complex and novel. Much could be said for their discussion as an original matter, but it is not an original matter. The Supreme Court has held that, without violating the first amendment, a public body may forbid its employees to run for elective office. *Clements v. Fashing,* 457 U.S. 957, 971–73, 102 S.Ct. 2836, 2847–49, 73 L.Ed.2d 508 (1982); *Broadrick v. Oklahoma,* 413 U.S. 601, 616–17, 93 S.Ct. 2908, 2918, 37 L.Ed.2d 830 (1973); *CSC v. Letter Carriers,* 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973). Cf. *United Public Workers v. Mitchell,* 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). These cases cover not only civil service employees (*Broadrick* and *Letter Carriers*) but also policymaking officials (*Clements*). Sheriff Mahan took the lesser step of putting the candidate on unpaid leave until the election was over. Whatever deep problems there may be in the resign-to-run statutes that the Court has upheld, the problems in today's case are no deeper.

Nonetheless, the majority treats this as a difficult and unsettled issue, hinting broadly that the plaintiff loses only because deputy sheriffs in Illinois are "policymakers" (implying that a civil service employee may not be put on unpaid leave while he runs for elective office) and adding that an elected official may not insist that even policymaking subor-

dinates toe the party line. Much of this discussion is unnecessary given *Broadrick* and *Clements* and implicitly contradicts those opinions. Indeed, a reader might infer from portions of the majority's opinion that *Broadrick* came out the other way and that the court therefore needs to distinguish policy-making appointees (who may be dismissed for having the wrong politics) from civil service employees (who may run for political office). *Broadrick* and *Clements* show, however, that there is no such dichotomy. I therefore join the judgment but not the opinion.

The majority mentions *Broadrick* in passing yet proceeds as if the Supreme Court had been mum about the application of the first amendment to resign-to-run rules. It does not cite *Clements* or *Letter Carriers.* Mahan ignores them too, concentrating on the defense of official immunity, on which he prevailed in the district court. The majority bypasses immunity; having elected to discuss at length a subject to which the defendant gives only cursory attention, my colleagues ought not proceed as if the whole law must be teased out of the few first amendment cases Mahan cites. That he did not find apt cases in the Supreme Court's jurisprudence does not require us to make up a new body of doctrine. See *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.,* —— U.S. ——, —— – ——, 113 S.Ct. 2173, 2177–79, 124 L.Ed.2d 402 (1993); *Kamen v. Kemper Financial Services, Inc.,* —— U.S. ——, ——, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991). But cf. *Elder v. Holloway,* 975 F.2d 1388 (9th Cir.1992), rehearing in banc denied, 984 F.2d 991 (1993), cert. granted, —— U.S. ——, 113 S.Ct. 3033, 125 L.Ed.2d 721 (1993). That the sheriff's rule cannot be called a "baby Hatch Act" also is irrelevant. Nothing in *Broadrick* or *Letter Carriers* depends on the fact that those statutes contained many rules on top of the prohibition against running for public office. So much is clear from *Clements,* where the prohibition stood alone. The Court treated the absence of other restraints on political activity as an extra reason to find the resign-to-run rule consistent with the Constitution. 457 U.S. at 972, 102 S.Ct. at 2848.

There remains a possibility that this case is special because Mahan's rule gives the sheriff discretion. According to the majority, "it would be rather a stretch of the Hatch Act cases to interpret them as authorizing a public official selectively to apply a 'resign to run' provision to his political enemies". Why so? Anyone running for his seat is an incumbent's "enemy," and Mahan no doubt would have suspended a Republican who sought his job. Treating in a political fashion those who stand for political office is not problematic. Selectivity means that the sheriff might let a deputy run for some other office—say, recorder of deeds or dog catcher. An incumbent planning to retire might even let a deputy run for sheriff. A rule providing that employees of Agency X may run for a job outside the agency, or within it if the incumbent is leaving, increases rather than reduces freedom of speech. The (lawful) alternative, recall, is a blanket prohibition on political activity. To say that the rule is less restrictive than it might be is to make it easier, not harder, to sustain.

There is of course the possibility that a sheriff "might invoke the regulation only against a deputy of whose views he disapproved" (opinion at 216). So, too, an absolute resign-to-run rule could be enforced sporadically, with higher-ups looking the other way when employees whose positions they approve run for office. The *possibility* of viewpoint discrimination (proper only when the employee holds a policymaking or confidential job) does not undermine the enforcement of a rule against someone who cannot plausibly make such a claim. Wilbur may not invoke the rights of third parties—especially not hypothetical third parties. Although the first amendment's overbreadth doctrine sometimes permits contentions that are deceptively similar to third-party standing, see Henry P. Monaghan, *Overbreadth,* 1981 Sup.Ct.Rev. 1, the Court's conclusion that the first amendment tolerates sweeping resign-to-run rules removes any basis for entertaining a "what-if …?" approach to Sheriff Mahan's regulation.

In addition to doubting a government's ability to keep civil servants out of politics,

the majority doubts a politician's ability to require his subordinates to promote his agenda. Although the majority (correctly) disparages the plaintiff's effort to subject all political discharges to an "open ended inquiry", it includes a discussion that will have a similar effect, implying that a political official may not condition the employment of even a confidential or policymaking official on adherence to debatable positions unrelated to the job. It is hard for judges to tell what is related to the job in politics; the people are free to vote for reasons we may think beside the point. They may elect a sheriff because of his position on hunting, even though judges can't see why. And it is easy for discharged (or suspended) employees to *say* that the particular grounds of the adverse action were not job-related, embroiling public officials in litigation that the judicial branch will handle with a high error rate. The majority's own hypothetical illustrates these points nicely. How to treat animals is a much-debated question in politics, and sheriffs may have good reasons for wanting deputies to be political ciphers. They may be called on to evict animal-rights protesters surrounding a clinic, and a sheriff would not be comfortable putting an animal-rights activist in charge.

Consider some parallels. Suppose President Clinton decides that because his Administration supports higher taxes, funding for abortions, and other hotly debated positions, all of his personal appointees must support these positions in public. (That is a standard instruction to political subordinates.) An assistant deputy undersecretary in the Department of Energy, whose job has no conceivable relation to abortion or taxes, gives a speech recommending a flat tax or the extension of the Hyde Amendment and is sacked. Must the President appear on the stand in some district court to prove to a jury's satisfaction that a show of agreement within the executive branch of government is important? Suppose the President instructs all of his top appointees to keep their mouths shut about any issue within the portfolio of some *other* department—so that only employees of the FDA and few other agencies may discuss experimentation on animals? Presidents, governors, and other chief executives believe that their subordinates work for "the Administration" rather than a particular subunit, and they insist that everyone pitch in for "the Administration's" program; members of Congress take the same view about their staffs. I assume that any political appointee at the Department of State who puts forward his own health care proposal will discover that his "resignation" has been accepted. Having scorned plaintiff's invitation to hold an inquest into the discharge of a Secretary of HHS, we should not invite equally open-ended litigation about the extent to which holders of high office may consider their subordinates' statements about the whaling policies of friendly governments, homosexuals in the military, and other political issues of the day.