### Maureen A. WARZON, Plaintiff–Appellant,

v.

### William R. DREW and Milwaukee County, Defendants–Appellees,

and

### Tommy Thompson, James R. Klauser, and Darryl Enriquez, Intervenors–Appellees.

No. 94–2687.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1995.

Decided July 19, 1995.

---

Walter Kelly (argued), Milwaukee, WI, for plaintiff-appellant.

Mark A. Grady (argued) and Robert E. Andrews, Office of the Corp. Counsel, Milwaukee, WI, for defendants-appellees.

Michael J. Losse, Office of the Atty. Gen., Wisconsin Department of Justice, Madison, WI, and John R. Dawson, and James L. Huston (argued), Foley & Lardner, Milwaukee, WI, for intervenors-appellees.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Maureen Warzon was appointed to the position of Controller with the Milwaukee County Department of Administration on September 29, 1991. Among Warzon's duties as Controller was the financial management and administration of the Milwaukee County Health Care Plan. The Health Care Plan furnishes medical, psychiatric and dental care to needy citizens throughout Milwaukee county. The cost of the Health Care Plan in 1992 was in the neighborhood of $50 million, and in that same year the county projected an $11 million deficit for the Health Care Plan. Approximately 60% of the bill for the Health Care Plan is funded from local property taxes, while the remainder is paid by the State of Wisconsin. Warzon alleges that because of these financial woes, Milwaukee County Executive F. Thomas Ament directed Warzon to concentrate her efforts on solving the crisis in the administration of the Health Care Plan. Pursuant to county ordinance, Warzon submitted monthly status reports to the Finance Committee of the Board of Supervisors, and she reported to William R. Drew, the Director of the Milwaukee County Department of Administration, and to Earl Hawkins, the County Fiscal and Budget Director.

In early 1992, Warzon hired a consultant, Health Care Management Consultants, Inc. (HCMC), to analyze the Health Care Plan and to suggest how to improve it. By late summer, the consultants were of the opinion that the greatest maladies in the Plan were "in eligibility and enrollment, as well as strong indications of excessive health care services, inappropriate billings, and a nearly complete absence of cost containment." On October 15, 1992, the consultant issued a final report, recommending a comprehensive Cost Containment Plan (CCP). Warzon believed that, by following the CCP, the Plan

could save $7 million in the first year, with even greater savings in the future.

As is often true of major changes in government services, not everyone was enamored with the CCP. Warzon alleges that, because of the lobbying efforts of the County Hospitals, who provided many of the services covered by the Health Care Plan, the County Board of Supervisors and Ament, who initially were receptive to the consultant's ideas, reversed their support. Instead, the Board called for a Task Force to investigate the Health Care Plan. Neither Warzon nor HCMC were named to this Task Force.

Nevertheless, believing the Board's position on the Health Care Plan to be wrong, Warzon included the CCP as a part of her 1993 proposed budget for the Health Care Plan. On October 27, 1992, the Board again declined to adopt the CCP, approving a Health Care Plan budget stripped of these recommendations. Standing steadfast in her belief that the Health Care Plan needed to be overhauled, "[a]fter the 1993 budget was adopted, Warzon wrote a letter urging the County Executive to veto the Plan budget, restore the funding cuts, and implement her Plan recommendations." County Executive Ament declined. In an inter-office memorandum dated November 20, 1992, Warzon warned Drew "that insufficient funding for the Corrective Action Plan [the CCP] ... places funding for general relief medical expenditures at risk. We ask you to strongly consider the actions taken by the Finance Committee and urge the County Executive to restore the 1993 Health Care Plan budget."

On November 27, Warzon "met with State officials to describe the problems in the Plan and seek assistance with the 1993 Cost Containment Plan." Warzon alleges that the State officials were initially receptive to her concerns. Two weeks later, in a letter to Ann Haney, the Administrator of the Wisconsin Department of Health & Social Services, Warzon continued her advocacy of the CCP.

On December 14, 1992, the *Milwaukee Journal* ran a story on the Health Care Plan's growing deficit. Warzon was quoted describing the growing deficit. In the article, County Finance Chairman Richard Nyklewicz questioned the accuracy of Warzon's projections and stated "Frankly, I have little confidence in the controller's handling of this matter to date. I remain skeptical and think the deficit number is actually lower." The next day, Warzon wrote to Drew and Hawkins, expressing her displeasure with Nyklewicz' comments. She also stated that she remained committed to the CCP.

In early 1993, the Task Force submitted a draft of its audit of the Health Care Plan. At Hawkins' request, Warzon submitted to him, on January 29, 1993, a response to the audit. Warzon disagreed with most of the audit's conclusions and expressed her continued support for the CCP. In an inter-office memorandum dated the same day, Drew withdrew from Warzon the authority for the Health Care Plan, effective February 1.

On February 2, Drew accused Warzon of misusing public funds by authorizing the payment of HCMC's fees for work done after Drew had instructed Warzon to cease using the consultant. The same day, Warzon wrote to Drew and Hawkins to respond to the allegation and to urge them to reinstate her authority over the Health Care Plan. Because the letter is significant, we quote it in full.

I have invested an extraordinary amount of time and energy, consistent with my duties and responsibilities as Controller, to resolve **serious fiscal problems** in the Milwaukee County Health Care Plan. I have been uncomfortable being put in the position of making unjustifiable payments to County-owned hospitals for excessive and unmanaged health care services provided to general relief recipients and uninsured County residents. During the past year I have informed the County Executive and the County Board of Supervisors of the terrible problems in the Health Care Plan and provided recommendations to remedy the situation. I have been resoundingly ignored.

I have repeatedly issued reports to the Finance Committee alerting them to a significant deficit in the Health Care Plan for 1992. My reports were received and placed on file with little or no discussion. I submitted a 1993 budget for the Health

Care Plan that incorporated fundamental changes in the program resulting in a $7 million reduction in expenditures. The Finance Committee stripped the initiatives out of the budget. As Controller, no one has allowed me to engage my authority to control health care costs. When I submitted new policies and procedures to reduce health care costs, I was told they could not be implemented unless the County-owned hospitals approved.

I implemented stricter controls to verify eligibility for the program and the Medical Complex over-rode the directive. When I disallowed bills to the Health Care Plan that were inappropriate, I was told that I could not deny payments to County-owned hospitals. I was forced to stand-by and watch while budget analysts who have no understanding of Health Care Plan issues prepared alternatives for Task force deliberations.

Everything that has transpired over the past year has left me exhausted and disheartened. But now the events of the past two days have me reeling. On Monday morning I was involuntarily relieved of my responsibility for the Health Care Plan. Today you accuse me of misuse of public funds for authorizing payments on the Health Care Management Consultant's Inc. (HCMC) contract. **Misuse of public funds is a blatant falsehood that was fabricated to discredit me.**

In your letter to HCMC dated October 27, 1992 your direction to them was to assist the Department of Audit. They were to be paid for services which they rendered. The contract states that HCMC must receive 30 days written notice of termination. You gave them no such notice nor was I directed to given them notice. HCMC was directed by the auditors to provide documentation that required restructuring the entire operational study of the Health Care Plan. This required significant time and effort on their part and they were paid for it.

When will you stop? Ever? I have steadfastly remained committed to Milwaukee County and the Health Care Plan. I have never had a greater responsibility nor been more seriously committed to a job. Please allow me to meet my responsibilities. (Emphasis in original).

Two days later, this letter found its way into the hands of the *Milwaukee Journal*, which reported on the situation. The same day, February 4, 1993, Drew informed Warzon that she was dismissed for cause from the position of Controller, effective that day.

Warzon filed this civil rights action, 42 U.S.C. § 1983, claiming that her dismissal violated her right to due process under the Fourteenth Amendment and was done in retaliation against her speaking out on the issue of the Health Care Plan, which violated her First Amendment rights. Warzon appeals from the lower court's dismissal of her case under Federal Rule of Civil Procedure 12(c). As the district court noted, although the defendants purported to file a Rule 12(b)(6) motion for dismissal, they had already filed their answer to Warzon's complaint. Because of the procedural posture, such a motion is construed as a motion for judgment on the pleadings pursuant to Rule 12(c). *See Republic Steel Corp. v. Pennsylvania Eng'g Corp.*, 785 F.2d 174, 182 (7th Cir.1986). We, like the district court, rely solely on Warzon's complaint and its attachments.

### First Amendment

Warzon contends that the district court erred in dismissing her First Amendment claim. The district court, in a well-reasoned opinion, concluded that Drew and Milwaukee County had not violated Warzon's free speech rights. Relying mainly on our opinion in *Wilbur v. Mahan*, 3 F.3d 214 (7th Cir.1993), the district court stated that, although a public employee does not lose all of her First Amendment rights by becoming a policymaker, she may be discharged on "political grounds." Warzon alleged in her complaint and its attachments that she was discharged for speaking out against the defendants' policy on the Health Care Plan. Taking that allegation as true, the district court concluded that she was discharged on political grounds. Additionally, the district court held that Warzon could prove no set of facts *consistent* with the allegations in her com-

plaint that would support a finding that she was not a policymaker. The court, therefore, held that the defendants did not violate Warzon's First Amendment rights by firing her for her views on the Health Care Plan. We review *de novo* the district court's dismissal for failure to state a claim. *Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir.1995).

■ In a line of cases beginning in the 1950s, the Supreme Court developed the principle that the government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). On the other hand, the Court recognized that the government qua employer must have greater power to regulate the speech of its employees than to regulate the speech of the citizenry. *Id.,* 461 U.S. at 157, 103 S.Ct. at 1692. To harmonize these principles, we conduct a two part inquiry, typically called the *Pickering* balance, named after the seminal Supreme Court decision in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). First, to state a cause of action, the employee must have been speaking about a matter of "public concern." If she was, the court balances the interests of the employee in commenting on the subject versus the interest of the public employer in an efficient workplace. *See Waters v. Churchill,* —— U.S. ——, ——, 114 S.Ct. 1878, 1884, 128 L.Ed.2d 686 (1994); *Wright v. Illinois Dep't of Children & Family Servs.,* 40 F.3d 1492, 1500 (7th Cir.1994).

In the related area of patronage dismissals, the Supreme Court has held that employment decisions for low-level public employees may not be made on the basis of political affiliation. *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). High-level employees, to wit policymakers, on the other hand, are subject to patronage dismissal. *Id.,* 497 U.S. at 74, 110 S.Ct. at 2737.

Courts and commentators have recognized that the patronage cases and the *Pickering* cases have similar but distinct rationales. *See, e.g., Heideman v. Wirsing,* 7 F.3d 659, 661–62 (7th Cir.1993); Craig D. Singer, Comment, *Conduct and Belief: Public Employees' First Amendment Rights to Free Expression and Political Affiliation,* 59 U.CHI. L.REV. 897 (1992). In the patronage cases, we are concerned primarily with elected officials' ability to execute their policies—to which the polity provided its imprimatur on election day—without the hinderance of political antagonists doing their bidding. In the typical *Pickering* case, on the other hand, we are more concerned with the efficiency of the agency. But these two goals are really very closely linked. In patronage cases, we are not solely concerned that the elected officials' mandate may be totally thwarted by the underling who disagrees with his boss' policies; we are also concerned about the efficiency with which the policy is effectuated. Thus the policy underlying *Pickering* cases is also present in patronage cases.

In *Wilbur,* we concluded that the patronage policymaker exception is also applicable to the *Pickering* analysis. We stated,

> we do not think that as soon as a case is shifted from the gravitational field of the patronage cases to that of the public employee speech cases such short cuts as presuming that a policymaking employee's electoral challenge is inconsistent with the effective operation of democratic government must go by the board and the employer must prove, as a matter of fact, a 'compelling governmental interest.' ... Categorical judgments based on experience and common sense play an important role in all areas of law. The exception recognized in the patronage cases for sensitive employees rests on such judgments and it retains its force in cases that have nothing directly to do with patronage or party affiliation.

*Wilbur,* 3 F.3d at 218. We categorically stated, "Once the employee is classified as confidential or policymaking, he can be fired on *political grounds* even if there is no evidence that he would not serve his political superiors loyally and competently." *Wilbur,* 3 F.3d at 218 (emphasis added). While it is possible to distinguish *Wilbur*—the plaintiff had decided to run against, in addition to speaking out against, his superior—we believe this distinction makes no difference.

The concern driving the policymaker exception "is with the effects on the operations of government of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies." *Wilbur,* 3 F.3d at 217–18. Such a concern is as acute when a person openly disagrees with an official's policy stance in a certain area.[1]

No one could argue (and Warzon does not attempt to do so) that the seriousness of and the appropriate remedy for the perceived crisis in government-provided medical care are not political issues. One need look no further than the health care debates in Congress over the last year to realize this.

Thus, if Warzon was a confidential or policymaking employee, her superiors could, consistent with the First Amendment, fire her for advocating positions in conflict with their stated policies. This issue is factual, and therefore we may affirm the dismissal only if Warzon could not prove any set of facts *consistent* with the allegations in her complaint that would support a finding that she was not a policymaker. *Murphy,* 51 F.3d at 717. Although Federal Rule of Civil Procedure 8(a)(2) requires only that a plaintiff's complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," by going beyond the bare minimum, a plaintiff may plead herself out of court. *Thomas v. Farley,* 31 F.3d 557, 558–59 (7th Cir.1994).

■ In *Nekolny v. Painter,* we adopted the following method to decide whether an employee was a policymaker: "The test is whether the position held by the individual authorizes, either directly or indirectly, meaningful input into government decision-making on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter,* 653 F.2d 1164, 1170 (7th Cir.1981). Warzon's complaint and attachments are replete with information showing that she had significant input into and authority over, among other things, the Health Care Plan.

■ An interoffice memorandum dated February 2, 1993, to Drew and Hawkins, attached to her complaint as Exhibit O, is most instructive as to her responsibilities as Controller. In the memorandum, Warzon complains that her recommendations for the Health Care Plan had not been followed.

I have invested an extraordinary amount of time and energy, consistent with my duties and responsibilities as Controller, to *resolve* **serious fiscal problems** in the Milwaukee County Health Care Plan.... During the past year I have informed the County Executive and the County Board of Supervisors of the terrible problems in the Health Care Plan and *provided recommendations to remedy the situation....* I submitted a 1993 budget for the Health Care Plan that *incorporated fundamental changes in the program* resulting in a $7 million reduction in expenditures.... As Controller, no one has allowed me to engage *my authority to control health care costs.* When *I submitted new policies and procedures* to reduce health care costs, I

---

1. This court has not decided how far this principle reaches. We have not had occasion to decide whether an elected official may fire a policymaker for speaking out on issues not related to her job. In *Wilbur,* we explicitly refused to rule on the extent of the exception, stating "The defendant claims the right to fire a confidential or policymaking employee on *any* ground. Interpreted literally, that is a questionable position, though not one on which we are required to rule in this case. The status of being a confidential or policymaking employee ... may not—though this is a more difficult question—expose him to being fired for engaging in forms of expression that have no conceivable bearing on his job." *Wilbur,* 3 F.3d at 217. In *Marshall v. Porter County Plan Comm'n,* we commented that, "Our cases do not restrict the rights of policymakers to such an extent that they have no First Amend-

ment rights, regardless of the content of their speech. The *Branti/Elrod* cases [*Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976)] apply when the plaintiff's *politics* are implicated in the discharge; then the court asks whether the plaintiff is in a policymaking or confidential position." 32 F.3d 1215, 1221 (7th Cir.1994) (emphasis added). This discussion, strictly speaking, was dicta because the plaintiffs in *Marshall* spoke out on issues that were directly related to their jobs. Nonetheless, what is "political" or drives voters' preferences can be interpreted very broadly and is difficult to assess. *See Wilbur,* 3 F.3d at 221 (Easterbrook, J. concurring). We may be wise to leave the decision of what type of speech by policymakers warrants dismissal to the elected official.

was told they could not be implemented unless the County-owned hospitals approved. *I implemented stricter controls* to verify eligibility of the program and the Medical Complex over-rode the directive. (Bold in original and emphases added).

The duties and responsibilities described in this memorandum are not those of an employee with only ministerial responsibilities, as Warzon argues. The position of Controller obviously has "meaningful input into government decisionmaking." That Warzon's recommendations did not ultimately carry the day has no bearing; the relevant inquiry is input, not absolute control. Moreover, Warzon alleged in her complaint that until the time that Drew withdrew from her the power over the Health Care Plan, she "was the financial manage[r] and administrat[or] of the [Health Care] Plan." Complaint ¶ 6. She had the authority to hire consultants, complaint ¶ 10, and submit proposed budgets for and reports on the status of the Health Care Plan. Complaint ¶¶ 13, 17. Warzon could not have proven facts consistent with the allegations in her complaint that would have supported a finding that she was not a policymaker, and therefore the district court correctly dismissed her First Amendment claim.

### Due Process

Warzon also alleges that the Defendants violated her Fourteenth Amendment right to due process of law by discharging her without notice and an opportunity to be heard. The district court concluded that Warzon had no property right in her position and therefore was entitled to no process. Again, we review the district court's decision *de novo*.

It is necessary for us to look to state law to determine whether an employee had a property right sufficient to entitle her to the full panoply of rights under the Due Process Clause. "[T]hey are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33

L.Ed.2d 548 (1972). In Wisconsin, "employment at will is the rule" for public employees. *Vorwald v. School District of River Falls,* 482 N.W.2d 93, 96, 167 Wis.2d 549, 557 (1992). Absent civil service regulations or a collective bargaining agreement, a public employee must look to a contract to establish a property right. Warzon claims that paragraph 3 of her contract entitles her to a property right in her job as Controller. Paragraph 3 states,

The term of employment shall be indefinite, subject to termination at the election of either the Appointing Authority or the Employe[r] upon ninety (90) days written notice prior to such termination, or such other lesser notice as the parties hereto may mutually agree. However, the Employe[r] may be removed or suspended from office at any time for actions as enumerated in Civil Service Rule VII, Section 4.

Although Drew alleges that he fired Warzon for cause—insubordination—we must (as we did earlier) accept as true Warzon's allegation in her complaint that she was discharged for voicing her opposition to Drew's Health Care Plan stance.

The contract places no substantive restriction on the county's authority to terminate Warzon; it merely states that she is entitled to 90 days notice if she is terminated for any reason other than cause. The Appointing Authority may still terminate Warzon for any reason. Such a provision may entitle Warzon to a state law cause of action for breach of contract, if she were terminated without notice and without cause. But this provision did not give Warzon an expectation of continuing employment, and therefore she had no property right in her position as controller. *See Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1405 (7th Cir.1994). The district court correctly dismissed Warzon's due process claim.

### Conclusion

The resolution of Warzon's First Amendment and Due Process claims disposes of the case. Thus, we do not reach the qualified immunity issue raised by Drew. Likewise,

the issues concerning the quashing of subpoenas issued to Tommy Thompson, Governor, State of Wisconsin, James Klauser, Secretary, Wisconsin Department of Administration, and Darryl Enriquez are rendered moot. The judgment of the district court is AFFIRMED.