Barbara MALONE, Plaintiff,

v.

INDIANAPOLIS HOUSING AGENCY, Eugene Jones, individually and in his official capacity as Executive Director, and City of Indianapolis, Defendant.

No. IP 00–0889–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Jan. 20, 2000.

Denise Larue, Haskin Lauter Cohen & Larue, Indianapolis, IN, for Plaintiff.

<hr />

4. Defendants' motion for Rule 11 sanctions also is denied as moot.

Kenneth J. Yerkes, Barnes & Thornburg, Indianapolis, IN, for Defendants.

## ENTRY DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

BARKER, Chief Judge.

Plaintiff, Barbara Malone ("Malone"), alleges that Defendants, Indianapolis Housing Agency ("IHA"), Eugene Jones ("Jones"), individually and in his official capacity as Executive Director, and the City of Indianapolis (collectively "Defendants"), fired her in retaliation for exercising her right to free speech under the First and Fourteenth Amendments to the United States Constitution, made actionable by 42 U.S.C. § 1983. Defendants request a Judgment on the Pleadings, pursuant to Federal Rule of Civil Procedure 12(c), citing the *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) line of Supreme Court cases and asserting that Malone's discharge for speaking out on issues of unlawful conduct and public safety is not actionable because Malone was employed in a policymaking position and therefore could be terminated for advocating policies in conflict with IHA's stated policies. For the reasons discussed below, Defendants' motion must be *DENIED.*

### *Factual Background*

Malone is a licensed attorney who worked for Indianapolis in various capacities for approximately five-and-a-half years. *See* Compl. ¶ 7. After serving as Assistant Corporation Counsel for the City of Indianapolis, representing the city in legal matters including law enforcement and employment related issues, Malone was hired by Jones, Executive Director of IHA as well as Secretary/Recording Officer for the IHA Board, as Legal Counsel for IHA on December 21, 1998. *See id.* ¶¶ 7, 8. She served IHA in this capacity until her termination on May 3, 1999. *See id.* ¶ 7.

While the Complaint does not define Malone's position as Legal Counsel, it does describe some of the responsibilities Malone undertook while there. Generally, the Complaint lists Malone's duties as: informing Jones that IHA lacked the legal authority to employ its own police force, known as public safety officers or public safety security officers; raising issues with Jones concerning threats to public health and safety; and pointing out IHA's potential liability posed by employing such a police force. *See id.* ¶¶ 10, 31. In addition, on or about April 19, 1999 Malone became responsible for handling all IHA insurance related issues. *See id.* ¶ 23.

In performing her duties, Malone engaged in independent research on the legal authority for IHA to employ its own police force. *See id.* ¶ 12. Based upon her findings, Malone determined that IHA did not have the legal authority to employ its own police force with "police powers" and reported this finding to Jones. *See id.* ¶ 12. Malone went on to suggest ways that IHA could properly obtain police powers and remedy this situation, such as contacting either the Indianapolis Police Department or the Marion County Sheriff, or obtaining legislation authorizing such powers from the state legislature. *See id.* ¶ 13.

After an IHA board member raised an issue related to IHA police and associated public safety issues, "Jones requested that Malone gather information and prepare historical prospective [sic] of the issue of IHA police powers as well as the ability of these police officers to moonlight and drive take-home IHA police vehicles." *Id.* ¶¶ 16–17. Malone prepared a presentation in which she delineated the history of IHA's police and identified that IHA did not currently have the legal authority to employ its own police force with police powers. *See id.* ¶ 19. This presentation was derived entirely from information found in documents which are matters of

public record and available to members of the general public. *See id.*

Malone was to make this presentation at an IHA board meeting on April 5, 1999. However, prior to this meeting she had given Jones a draft to review. *See id.* ¶ 20. Jones informed Malone that he did not agree with either her conclusion that IHA lacked the statutory authority to employ its own police force or her suggestion that IHA obtain an independent legal opinion concerning the issue. *See id.* Jones served as the chairperson for the April 5 meeting and tabled discussion concerning IHA's police force before Malone could make her presentation. *See id.* ¶ 21. After Jones prevented Malone a second time from making her presentation at an April 19, 1999, board meeting, Jones scheduled her presentation for a "special meeting" to be held on May 5, 1999. *See id.* ¶ 22.

On April 30, 1999, Malone was contacted by Marcia Pierce, IHA's Deputy Executive Director, who informed Malone that Jones had directed Pierce to obtain Malone's memorandum regarding the IHA police issue. *See id.* ¶ 25. Later that afternoon, Jones sent Malone a voice mail stating: "If you say or do one more thing concerning public safety issues I will fire you first thing on Monday." *Id.* ¶ 26. When Malone reported to work on Monday May 3, 1999, immediately prior to Malone's scheduled presentation at the special meeting, Jones summarily terminated her employment, purportedly for unsatisfactory performance. *See id.* ¶¶ 27, 28. Although this was the stated reason, Malone claims that, at all times during her employment, she had "performed her job to the legitimate expectations of her employer." *Id.* ¶ 9.

Malone believes that Jones' asserted reason for firing her was pretextual. *See id.* ¶ 34. She feels that her speech constituted a substantial and/or motivating factor in Jones' decision to terminate her employment. *See id.* This speech was focused solely on matters concerning IHA police and the public's safety and welfare.

*See id.* ¶ 32. Following her termination, Malone filed her complaint in this action seeking damages for a violation of her constitutional rights.

## Discussion

### A. Standard of Review

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Rule 12(c) permits a party to move for judgment after the parties have filed the complaint and answer. *See* FED. R. CIV. P. 12(c). The pleadings include the complaint, the answer, and any written instruments attached as exhibits. *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir. 1998). In considering a motion for judgment on the pleadings, courts employ the same standard as that applied to a motion to dismiss under Rule 12(b). *See Evans v. Lederle Laboratories,* 167 F.3d 1106, 1108 (7th Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 325, 145 L.Ed.2d 254 (1999); *Northern Indiana Gun,* 163 F.3d at 452. The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520–21 (7th Cir. 1990). Accordingly, we will grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief. We view the facts in the complaint in the light most favorable to the non-moving party." *See Craigs, Inc. v. General Elec. Capital Corp.,* 12 F.3d 686, 688 (7th Cir. 1993).

To succeed on a Rule 12(c) motion, the moving party must demonstrate that there are no material issues of fact to be resolved. *See Northern Indiana Gun,* 163 F.3d at 452. However, we are not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported

conclusions of law. *See R.J.R. Servs., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir.1989). "Although Federal Rule of Civil Procedure 8(a)(2) requires only that a plaintiff's complaint contain 'a short and plain statement of the claim showing that the pleader is entitled to relief,' by going beyond the bare minimum, a plaintiff may plead herself out of court." *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir.1995).

### B. First Amendment Protections

■ In order to establish a claim of discharge in retaliation for exercising First Amendment rights, the plaintiff must show that her speech was constitutionally protected under the circumstances, and that the defendants retaliated against her because of that speech. *See, e.g., Ryan v. Illinois Dep't of Children and Family Servs.*, 185 F.3d 751, 758 (7th Cir.1999). Where the plaintiff involved is a public employee, the Supreme Court has enunciated the principle that the government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Warzon*, 60 F.3d at 1238. However, the government qua employer requires greater power to regulate the speech of its employees than that of the citizenry at large. *See Connick*, 461 U.S. at 157, 103 S.Ct. 1684; *Warzon*, 60 F.3d at 1238. Thus, a two-part inquiry is conducted named after *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). *See Warzon*, 60 F.3d at 1238. "First, to state a cause of action, the employee must have been speaking about a matter of 'public concern.' If she was, the court balances the interests of the employee in commenting on the subject versus the interest of the public employer in an efficient workplace." *Id.* (citing *Waters v. Churchill*, 511 U.S. 661, 668, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994)). A related line of "patronage" cases provides the government broader discretion when the pub-

lic employee is a "[h]igh-level employee[.], to wit [a] policymaker[ ]." *Id.* These "patronage" cases are actually a subset of the general First Amendment retaliation cases. *See Marshall v. Porter County Plan Comm'n*, 32 F.3d 1215, 1220 (7th Cir.1994); *Wilbur v. Mahan*, 3 F.3d 214, 219 (7th Cir.1993). As such, whether the employee's speech is protected is determined by looking at its "content, form, and context . . . ." *Connick*, 461 U.S. at 147–48, 103 S.Ct. 1684.

■ Once a plaintiff is designated a confidential or policymaking employee, he or she is subject to "patronage dismissal," *id.* (citing *Rutan*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)), and "may, under some circumstances" be discharged for their political beliefs, political associations or on political grounds. *See Ryan*, 185 F.3d at 759; *Warzon*, 60 F.3d at 1238; *Marshall*, 32 F.3d at 1221; *Wilbur*, 3 F.3d at 218. "The concern driving the policymaking exception 'is with the effects on the operations of government of forcing a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and may be his political enemies.'" *Warzon*, 60 F.3d at 1239 (quoting *Wilbur*, 3 F.3d at 217–18). Thus, an employer may fire a policymaker "for *advocating* positions in conflict with their stated policies." *Id.* (emphasis added).

However, just because an employee is a policymaker, she does not lose entirely her right to free speech. *See Marshall*, 32 F.3d at 1221; *Wilbur*, 3 F.3d at 217. To fit within the patronage exception, it is not enough that the plaintiff hold a policymaking position; "the plaintiff's politics [must be] implicated in the discharge . . . ." *Marshall*, 32 F.3d at 1221. For the reasons explicated below, we find that it is possible for Malone to prove facts consistent with her complaint that would show that she was not terminated from IHA for "political

reasons."[1]

The Seventh Circuit has had several occasions to elucidate the content of speech that is implicated by the "policymaker" exception. In *Marshall,* the Seventh Circuit made clear that there are limitations on the power of government officials to fire policymakers. Marshall was the executive secretary of a county Plan Commission. *Id.* at 1217. She was terminated after contacting a County Commissioner, the Policy Committee of the Plan Commission, and an attorney for the Plan Commission to express her belief that her superior was making fraudulent claims for excessive mileage and failing to make required building inspections. *See id.* In holding that this speech did not warrant application of the policymaker exception to the standard First Amendment analysis, the court noted "she was not aspiring towards [her superior's] position, nor was she attempting to oust one who belonged to a different party or party faction. The defendants do not argue that [her] discharge resulted from her political associations; nor do they argue that she supported the wrong candidate for office." *Id.* at 1221.

In *Warzon,* the Seventh Circuit's opinion provided insight into both the content of the speech within the exception as well as the context and form that the exception covers. The court assumed that the plaintiff was fired for "political reasons" and focused on whether she was a policymaker. *See id.* at 1239. Although the court assumed that the political impetus for her termination existed, it also described the political content of the speech. *See id.* The court simply stated that "the seriousness of and appropriate remedy for the perceived crisis in government-provided medical care are ... political issues. One need look no further than the health care

debates in Congress over the last year to realize this." *Id.* The opinion also provided a detailed description of the context and form of the plaintiff's speech. The plaintiff went beyond the scope of her position's authority and did not simply recommend a course of action to follow in the health care debate; instead, she continuously and publicly advocated her position after her superiors repeatedly had voted not to accept her recommendations. *See id.* at 1236 (describing plaintiff's behavior as including a proposal which the Board had previously rejected in a proposed budget, writing a letter to the County Executive urging him to veto the Board's budget without her proposal, writing a memorandum to the Director of the County Department of Administration urging him to implement her recommendation after the County Executive declined to veto the budget, writing letters to state officials urging them to become involved in the issue, communicating with the Milwaukee Journal on a health care story extensively opposing the policy position chosen by the County and touting her recommendations, and finally having been given the task of commenting on an audit of the proposed health care plan, absent her recommendations, she "disagreed with most of the audit's conclusions and expressed her continued support for the CCP.") *see also Wilbur,* 3 F.3d at 215 (applying exception to firing of deputy sheriff who announced his candidacy for the office of sheriff and who ran in opposition to the current sheriff); *Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir.1988) (upholding termination of athletic director for publicly expressing views on policy matters that reflected a policy disagreement with his superiors such that they could not expect him to carry out their policy choices vigorously).[2]

---

1. Since Malone can prove facts consistent with her complaint that would show she was not fired for "political reasons," and therefore not subject to the policymaker exception, we do not discuss whether Malone is properly classified as a policymaker.

2. The only other Seventh Circuit case in which the policymaking exception has been discussed did not reach the scope of the exception because the case involved only whether the exception had been clearly established at the time of the events in question for qualified-immunity purposes. *See Ryan,* 185 F.3d

*Marshall* clarifies that the content of the "for political reasons" prong of the policy-making exception does not include speech such as reporting potential violations of law. "[S]peech that accurately exposes official impropriety or corruption ... has generally been accorded the greatest level of First Amendment protection." *Jefferson v. Ambroz*, 90 F.3d 1291, 1299 (7th Cir.1996) (Rovner, J. concurring). A distinction must be made between speech that advocates a position in opposition to an internal policy and speech that accurately exposes a policy that is without legal authority.[3]

Malone's speech obviously exemplifies the latter. Although Defendants presume that the cause of Malone's termination was "political" and proceed directly to the question of whether she was a policymaker, *see* Reply Br. in Supp. of Mot. for J. on the Pleadings ("Reply") at 2 (relying on *Warzon*, 60 F.3d at 1239), we perceive that Malone's evidence in support of her allegations might well remove this case from the policymaking exception. Further, we do not believe that *Warzon* provides an apt analogy to this case. Malone has alleged that as Legal Counsel for IHA she uncovered a practice—employing a public safety force with "police powers"—that was illegal. After researching the topic, she advised Jones of her findings and claims that Jones gave her the additional task of gathering information and preparing an "historical prospective [sic]" on the authority for IHA police powers. Compl. ¶¶ 16–17. At Jones' request, Malone was to present her findings to the IHA board. Jones did not agree with the results of this investigation for which he fired Malone.

This is not a case where Malone's "termination resulted from partisan politics." *Marshall*, 32 F.3d at 1221. Like the plaintiff in *Marshall*, Malone was not terminated due to her political associations or because she supported the "wrong" candidate. She was not trying to publicly campaign against Jones or going to the general public regarding confidential or politically contentious issues. Public corruption is a political issue only until such time as it is determined that the corruption actually exists. The underlying facts of the illegal behavior are not themselves political; rather it is the process of effecting an appropriate remedy that may take a political form.[4]

*Marshall*, *Warzon*, and *Wilbur* teach us that the context and form of speech contained within the exception involves public advocacy. The employer need not treat a plaintiff any differently in response to her active campaigning against an agency's policies than it treats a plaintiff who actively campaigns against her superior. Thus, an employee who chooses to make public her grievances regarding the political choice made by her supervisors is as vulnerable to termination as an employee who seeks to replace her superior in office. In both cases, plaintiff's politics are impli-

---

at 759; *see also McEvoy v. Spencer*, 124 F.3d 92, 103–04 (2d Cir.1997) (applying doctrine of qualified immunity to termination of police chief, but holding that the policymaking status of a discharged employee is not dispositive in a pure free speech situation); *Finkelstein v. Bergna*, 924 F.2d 1449, 1453–54 (9th Cir.1991) (applying doctrine of qualified immunity to firing of county prosecutor because it was not clearly established at the time of the termination whether he was a "policymaker" but "reject[ing] the proposition that prosecutors have unfettered discretion to discipline assistant prosecutors for exercising their first amendment rights").

3. The Second Circuit has similarly distinguished speech that is directed toward uncovering internal corruption from "political" speech covered by the policymaking exception. *See Dangler v. New York City Off Track Betting Corp.*, 193 F.3d 130, 138 (2d Cir.1999) (reversing dismissal of plaintiff's First Amendment retaliation claim and holding policymaking exception did not allow defendant to terminate plaintiff in retaliation for relaying to investigative officials information suggesting that his superiors were engaging in improper or corrupt behavior).

4. It is, of course, also possible that the subsequent remedial course of action would bring the matter within the realm of judicial authority.

cated by her decision to solicit public support for her views that are contrary to the agency position.

▮ However, Malone's authorized research into the legal authority for an agency policy and conclusion on the basis of that research that authorities do not support the agency view is patently distinguishable from publicly advocating against a policy. As discussed previously, Malone's speech involved disclosure of what she believed to be illegal activity, to wit, the exercise of police powers by IHA. That sort of disclosure is treated as an exception to the policymaking exception. Moreover, Malone's actions did not entail publicly "advocating" a position. She did not disseminate her conclusions to the media. She did not press the issue with the Board, despite Jones' refusal to allow her to make her presentation and she did not advance her concerns beyond the Board to any parties outside of IHA. All her actions were limited to those requested of her by Jones. That he disagreed with her conclusions did not transform the disagreement into a "political" matter sufficient to justify her termination.

### C. Conclusion

It is clear that Malone could adduce facts consistent with her complaint to establish that her speech was not "political," as that term is utilized in the policymaker exception to standard First Amendment analysis. On the face of the pleadings, Jones' termination of Malone did not implicate the policymaker exception. Malone has thus stated a claim for which relief may be granted, and we must deny Defendants' motion for judgment on the pleadings.

### Conclusion

For the reasons discussed, Defendants' motion for judgment on the pleadings is *DENIED*.