**Stephen NEFF, Plaintiff,**

v.

**James HMUROVICH, individually and in his official capacity; STEVEN VAUGHN, individually and in his official capacity; The Family and Social Services Administration and State of Indiana, Defendant.**

**No. IP01–0582–C B/F.**

United States District Court, S.D. Indiana, Indianapolis Division.

May 13, 2003.

Terry R. Boesch, Boesch & Istrabadi, PC, Valparaiso, IN, for Plaintiff.

Patricia O. Grow, Deputy Indiana Attorney General, Indianapolis, IN, for Defendant.

## ENTRY ON DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND FOR SUMMARY JUDGMENT

BARKER, District Judge.

### I. *Introduction.*

Stephen Neff alleges three federal and three state causes of action against his former employer, the Indiana Department of Family and Social Services Administration (hereafter "the FSSA" or "the State"), and the two named individuals in their individual and official capacities. All of his claims grow out of his employment as Director of the Marshall County Division of Family and Children Services (hereafter "DFC"), which is a subdivision of FSSA. Mr. Neff alleges that he was suspended and demoted from his position as Director in retaliation for refusing to follow orders to take or support political positions for which he had no sympathy and for refusing to sign a politically-motivated affidavit which unfairly placed blame on the County Prosecutor's office. Then, when statewide Director of the DFC, James Hmurovich, spoke to the press about Mr. Neff's job performance, he prevented Mr. Neff from responding to his comments.

Mr. Neff's federal claims include that: (1) Mr. Hmurovich suspended Mr. Neff and demoted him from his position as Director of the Marshall County DFC as a result of a partisan political agenda unrelated to Mr. Neff's work (Count II); (2) Mr. Hmurovich suspended him and demoted him in retaliation for exercising his First Amendment rights (Count III); and (3) Mr. Hmurovich and Mr. Vaughn conspired to deprive him of his constitutional right to free expression and political affiliation (Count IV). His state law claims include that the defendants: (1) defamed him by, among other things, publicly discrediting his work performance and publicly lying about his role in the release of a convicted felon (Count I); (2) intentionally inflicted emotional distress on him by harassing him and publicly humiliating him (Count V); and (3) violated Indiana public policy by violating his right as a merit employee to pursue his career free of political and partisan biases (Count VI).

The case is before us on defendants' dispositive motion, which they style as a motion for "judgment on the pleadings and for summary judgment." The portion of the motion that asks for judgment on the pleadings has become moot. The defendants have properly noted that the FSSA, the State of Indiana, and Messrs. Hmurovich and Vaughn in their official capacities are not proper defendants in this federal court action because of the Eleventh Amendment's doctrine of sovereign immunity. Since Mr. Neff concedes this point, we have no occasion to address it further. Additionally, Mr. Neff acknowledges that Count VI does not state a viable cause of action and agrees to the dismissal of that claim. Accordingly, with the exception of one wrinkle that we address in sub-part D below, the parties have whittled the claims

down to three federal causes of action against Messrs. Hmurovich and Vaughn in their individual capacities, along with pendent state claims which Mr. Neff alleges against the state agencies as well as the named defendants.

These surviving claims are before us on defendants' motion for summary judgment. For the following reasons, we GRANT defendants' motion as to Mr. Neff's federal claims and we decline to exercise jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367. Accordingly, we DISMISS Mr. Neff's pendent state claims WITHOUT PREJUDICE.

## II. *Statement of Facts.*

This case consists of two very different factual recitations. On a motion for summary judgment, we, of course, construe all disputed facts in a light reasonably most favorable to Mr. Neff as the party opposing the motion. By "reasonably" most favorable, we mean most favorable in light of the facts that are supported by admissible evidence. The reason for expressing this qualification, though it should be obvious, will become clearer as we proceed. For now, suffice to say that the parties offer factual narratives that are not only divergent, but pass one another like ships in the night.

### A. *The State's Factual Statement.*

The FSSA is an agency of the State of Indiana. The Division of Family and Children is a subdivision of the FSSA. At all pertinent times, James Hmurovich was state-wide director of the DFC. In 1995, he appointed Mr. Neff as Director of the DFC for Marshall County. Mr. Neff served in that position until January 7, 2001. Steve Vaughn was the Northwest Regional Manager of the DFC. Def. S.J. Brief, p. 2, ¶¶ 1, 3, 6.

Mr. Hmurovich's responsibilities as County Director included: the establishment of policy for his agency; communica-tion of the policy through written directives and through monthly regional meetings and two annual statewide workshops; establishment of child welfare consultants; establishment of a quality assurance process; use of management reports from the Indiana Child Welfare Information System (ICWIS) to monitor activities; establishment of comprehensive training; and use of peer mentors. As Director of the Marshall County Office, Mr. Neff reported to Mr. Hmurovich and oversaw eighteen staff members; he had final responsibility for everyone in the office and had authority to hire and fire.

Mr. Neff acknowledges that he had "responsibility to investigate cases of abuse and neglect" and "to insure the safety of children once they were in [his] agency." Mr. Neff also prepared budgets and submitted them annually; he administered child welfare services and public assistance programs; he appointed and oversaw child protection teams and prepared child protection plans; he attended court with case workers or family case managers; he was involved in quality control issues; and he developed procedures to implement policy. Def. S.J. Brief, pp. 2–3, ¶¶ 5, 8, 9.

Effective July 1, 1999, Mr. Hmurovich's Policy Directive # 1–Z–012 on Child Welfare Quality Assurance Reviews ("QAR") revised the policy and procedures governing reviews of county child welfare activities and functions for quality assurance. Mr. Hmurovich directed that reviews be conducted of all county offices and that the reviews were to be completed within a two-year time period. The review teams were appointed by the Regional Managers.

The FSSA's unchallenged description of the QA review process is that it is "an assessment of the integrity of child welfare services" provided by all county offices, including Marshall County's. It is undisputed that: "The review serves as an ob-

jective measurement of compliance with child welfare statutes, rules, policies, and practice and assists local and divisional management staff in determining opportunities for program enhancement." Def. S.J. Brief, p. 4, ¶¶ 15, 16.

Directive Z–012 provides for an elaborate investigation into each county's case management. Since the FSSA's description is unchallenged, suffice to say that the process includes a random selection of open and closed investigations and informal adjustments. The QAR team reviewed hard copy case files as well as the pertinent database for each selected case. "Worksheets, containing necessary statutory program and rule compliance, policy and practice elements specific to the type of case reviewed, were completed for each case reviewed. Interview questionnaires containing questions designed to obtain the interviewee's knowledge and actual experience in dealings with Marshall County local office child welfare services and staff were completed for the Circuit Court Judge, a Family Therapist, a foster parent, a child welfare staff member, and the County Director." Def. S.J. Brief, pp. 4–5, ¶ 16.

Terry Ciboch, Director of the LaPorte County Office, prepared a report of the September 21–22, 2000 QAR for the Marshall County Office. The report—detailed in Terry Ciboch's declaration and exhibited in eight single-spaced, densely packed pages [Def. Ex. D]—revealed that Marshall County's case management was woefully deficient in all areas reviewed. The FSSA asserts, without contradiction, that an acceptable level of performance is 90%. De. S.J. Brief, p. 5, ¶ 18. Marshall County's ratings fell far below acceptable. According to the State's unrebutted statistics:

> Intake and Investigation: 51%, At Risk score/Intake and Investigations: 62%. CHINS/Wardship Case Management: 53%, At Risk score/CHINS Management: 69%. Informal Adjustments: 26%, At Risk score/Informal Adjustments: 30%; Service Referral Agreement: 48%, At Risk score/Service Referral Agreement: 60%; Adoption: 75%, At Risk/Adoption: 81%. (Ciboch Decl. ¶ 8.)

> The QAR found Child Protective Services Reports, including sexual molestation and neglect, had not been investigated for six to eight months. In addition, a Family Case Manager had 130 uninvestigated reports.

Def. S.J. Brief, pp. 5–6, ¶¶ 19, 20.

Mr. Neff does not challenge that he was aware of the DFC's policies, methods, and procedures. Def. S.J. Brief, p. 6, ¶ 21. Terry Ciboch asked Mr. Neff to explain how so many investigations could be placed in the closed case category. According to Terry Ciboch, Mr. Neff indicated that it could have been the result of linking current investigations with previously closed cases as a result of "a systems problem." Terry Ciboch posed the question of whether a systems failure inadvertently could have produced this result to Sandy Lock, the State ICWIS director. Terry Ciboch was satisfied with Sandy Lock's explanation that such a result was not possible, because a specific code had to be entered in order to close any case. Additionally, cases may be closed only with supervisor approval and Mr. Neff was the relevant supervisor in Marshall County. Def. S.J. Brief, p. 6, ¶¶ 23–25.

Terry Ciboch concluded that, based on the QAR, problems in Marshall County's case management were not owing to a lack of training. Instead, Terry Ciboch determined that Mr. Neff was failing to manage staff and hold them accountable. Terry Ciboch further concluded that children in Marshall County were at risk or in jeopardy because of poor case management at-

tributable to Mr. Neff. Def. S.J. Brief, p. 7, ¶¶ 28, 29.

Northwest Regional Manager Steven Vaughn received the preliminary results of the September 2000 QAR from Terry Ciboch. Mr. Vaughn, in turn, notified DFC Director Hmurovich of the preliminary findings. Def. S.J. Brief, p. 7, ¶ 30. In late September 2000, during the Directors' Fall Workshop, Mr. Hmurovich met with Mr. Neff to discuss the preliminary results of the QAR for Marshall County. Mr. Hmurovich told Mr. Neff that the problems were serious and that he would be relieved of responsibility for child welfare supervision; he also told Mr. Neff that another county director would be temporarily assigned to manage Marshall County's child welfare services. Def. S.J. Brief, pp. 7–8, ¶ 31.

Mr. Hmurovich assigned Laurel Myers, Office Director of Pulaski County, to serve as acting supervisor in Marshall County for approximately 30–45 days while a full case review of the office was conducted. Mr. Neff remained responsible for overall management of the office during that period. When Ms. Myers was assigned the temporary oversight position, the following problems needed to be addressed:

- Investigations were not timely. Cases revealed that Child Protective Services reports were made, yet no ICWIS determination decision as to their disposition was made within the requisite 48 hours. Intakes were in the system awaiting supervisory approval. Once a report was made, the investigation was late or not conducted.
- Paper documentation was either nonexistent or deficient on cases and no ICWIS entry was available. Investigations often sat for many days with no contact with the family.
- Once an investigation is begun, DFC has 90 days to complete it. Yet it was noted that one worker had over 150

cases pending more than 90 days, and some were years overdue.
- Services were not always offered or appropriate for the case.
- 30/90–day follow up reports were not being sent.
- Training was inadequate.

Def. S.J. Brief, pp. 8–9, ¶¶ 33.

After reading the September 2000 QA report, Mr. Hmurovich directed that a follow-up case review be conducted in accordance with the review policy. After Ms. Myers took over as acting child welfare supervisor, she identified various problems which impeded casework: ineffective sign-out sheets, caseload distribution, basic training needs, office resource needs, and inappropriate delegation of staff responsibilities; case numbers from prior reports were not being linked; time-lines were ignored; placement changes were not entered appropriately; court information and documentation was missing; eligibility information was missing or, more importantly, information was put in to make the case eligible for Title IV–E when in fact, it was not (resulting in reimbursement claimed for children who did not meet the criteria); cases involving "Title IV–EA" funds had improper use of "voluntary placement"; Mr. Neff assigned reports to a worker who was on sick leave; "IV–E" pending rosters were never checked or worked; Juvenile delinquent/Juvenile status (JD/JS) cases had not been entered into the system; most investigations were referred to law enforcement agencies and the office provided no services or contact with the family for a period of six to eight months. Def. S.J. Brief, p. 10, ¶ 39.

In addition, this follow-up review revealed seventy-five cases that had no hard case files or ICWIS entry other than the initial report; fifty of these required investigation. Some had been assigned to the "closed" caseload. The FSSA points to an

example involving a failure-to-thrive two-month-old infant. An initial report was made on March 15, 2000 and given to a caseworker. The report was never entered in the database, but the handwritten copy of the "310" report was in the office. A second report on the same infant came from the hospital on April 4, 2000. Mr. Neff assigned it to the caseworker on April 10, 2000, but it was assigned to the "closed" caseload. It appeared that no work ever had been done on this case. The assigned case worker could produce no notes, service referrals, or 30/90–day follow-up reports. Def. S.J., Brief, p. 11, ¶ 41.

Ms. Myers prepared a summary report of these problems and staff concerns to Mr. Vaughn and Mr. Hmurovich on October 25, 2000. On November 19, 2000, she was appointed Interim Director of the Marshall County Office, assuming responsibility for all aspects of the office. ¶¶ 42, 43. Upon taking over as Interim Director, Ms. Myers found other problems. A non-exhaustive list includes: no discipline or work improvement plans were issued to two caseworkers who were performing unsatisfactorily; the Account Clerk completed the payroll and submitted it without Mr. Neff's approval; all claims for payment by the County Auditor were completed and submitted without Mr. Neff's approval; and all procurement and Special Disbursing Office (SDO) purchases were done without Mr. Neff's approval. In addition, Ms. Myers uncovered other reports in the "zz closed" administrative file where no action had been taken. Pl. S.J. Brief, pp. ¶¶ 45–46.

In sum, the October 2000 QAR report of Marshall County identified the following five areas that were in violation of policy, procedure, and law: (1) timeliness of investigations (151 incomplete investigations; 61 remaining investigations with no hard copy documentation); (2) referrals to law enforcement agencies; (3) determining the safety and level of risk; (4) investigative techniques; and (5) supervision. The overall actual score of the October 2000 QAR of the Marshall County Office was 42%; at risk score 28%. Many areas of the review received a score of zero percent. Def. S.J. Brief, p. 13, ¶¶ 48, 49.

After reviewing this report, Mr. Hmurovich notified Mr. Neff on November 5, 2000 that he was scheduling a pre-deprivation meeting. During Mr. Neff's five years of service, three different peer reviews were conducted. All three were unsatisfactory. On November 6, 2000, Mr. Vaughn met with Mr. Neff to discuss the findings of the October 2000 QAR. Based on the poor results and serious problems, Mr. Neff was asked if would accept a voluntary demotion. He rejected the offer.

A pre-deprivation meeting was conducted on November 17, 2000, attended by, among others: DFC Director Hmurovich; Northwest Regional Manager, Steve Vaughn; LaPorte County Director, Terry Ciboch; Pulaski County Director and Interim Director of Marshall County, Laurel Myers; and Deputy General Counsel, Elizabeth Brown.

The purpose of the meeting was to consider whether the allegations of Mr. Neff's failure to provide adequate supervision and leadership for child welfare services in the Marshall County Office of Family and Children were accurate. Mr. Hmurovich concluded that the findings were well documented. Accordingly, on November 17 he suspended Mr. Neff for four weeks without pay effective December 10, 2000 through and including January 6, 2001. Effective January 7, 2001, Mr. Neff was demoted to a Family Case Coordinator Supervisor 5/7AQ5. Def. S.J., Brief, pp. 14–15, ¶¶ 50–54, 56.

## B. *Mr. Neff's Factual Statement.*

With the exception of two rather perfunctory paragraphs, Pl. Opp., p. 3, Mr. Neff does not challenge the State's factual narrative. Accordingly, we must take the State's account of the facts as true. Local Rule 56. Instead of rebutting the State's factual recitation, Mr. Neff presents an alternative scenario. He asserts that he was doing a good job and that the problems that the QAR reports revealed were the result of computer glitches. Pl. Opp., p. 3. He also alleges that he was the victim of a political witch-hunt.

We present the following recitation from Mr. Neff's opposition brief virtually in verbatim form. We note at the outset that the only source Mr. Neff cites in support of his rendition of the facts is his own deposition testimony.

Mr. Neff alleges that, at some undefined point in his employment at the DFC, he was "directed by Democratic appointee, James Hmurovich, to lobby on behalf of the Governor or be subject to disciplinary action." At some undefined point in his employment at DFC, he was "coerced by Democratic appointee, Steve Vaughn, to attend a political gathering supportive of the incumbent party." Additionally, Mr. Neff was "pressured by a representative of the Governor to take a particular action in a high-profile case, which Mr. Neff deemed violative of legal procedure, to protect the Governor and his political party from the heat." Finally, "[o]n more than one occasion, Jim Hmurovich asked Mr. Neff to make derogatory statements regarding elected officials who were of a different political party than the Governor."

Then, in March 2000, Mr. Hmurovich instructed plaintiff to obtain statements from his staff in the form of affidavits to be used to discredit the County Prosecutor. Hmurovich directed that the affidavits state that the County Prosecutor failed to inform the staff of an early prison release date of a convicted child abuser in a high-profile case. The Department of Corrections was charged with the duty of notification of the release of convicted child abusers. In requesting said affidavits, Hmurovich stated that he wanted to get the Marshall County Prosecutor. Mr. Neff and his staff were uneasy and fearful about signing such affidavits because they would falsely imply a duty on the County Prosecutor which was incorrect.

Mr. Neff and his staff did not want to sign the afore-mentioned affidavits because it implied that the County Prosecutor was responsible and at fault. The document would have impeded relations between Mr. Neff's office and the County Prosecutor's office in providing for the needs of families and children in Marshall County. Mr. Neff and his staff did not wish to sign such affidavits because the meeting which was the subject of said affidavits was a confidential meeting.

As to the September 2000 review of Mr. Neff's department in Marshall County— the only point at which Mr. Neff seeks to rebut the State's argument—Mr. Neff asserts in general that: "Marshall County had an excellent record of providing for the safety of children residing there." He explains more specifically that the QAR team examined only "a random sampling" of files and not all of them. Additionally, when Mr. Hmurovich discussed the findings of the QA review with him, Mr. Hmurovich was "accusative and almost hateful to Mr. Neff." Finally, Mr. Neff alleges that "[t]here were numerous problems with the Marshall County computer system." And that "Mr. Neff was not the only individual having access to the computer system." And that "Mr. Neff was given conflicting and inconsistent guidance with respect to the computer system".

Mr. Neff argues that, in the aftermath of his suspension and demotion, he was "the subject of publicity by defendants regarding his suspension, demotion and termination."[1] He alleges that Mr. Hmurovich "made false comments to the press about Mr. Neff's job performance" and comments that "call[ed] into question the safety of children in Marshall County". Mr. Neff alleges that Mr. Vaughan also "made statements to the press casting doubt upon the efficacy of the Marshall County DFC Office."

### III. *Discussion.*

A. *The Standard on Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex*, 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 249–52, 106 S.Ct. 2505).

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge*, 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi*, 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. See *Shields Enters., Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but mandated. *See*

---

1. We note that Mr. Neff does not allege that he was discharged, either actually or constructively. The unrebutted facts on the record show that he was suspended for four weeks—from December 10, 2000 January 7, 2001—without pay and demoted from his position as Director and to the position of Family Case Coordinator Supervisor 5/7AQ5. Def.

Brief, p. 14, ¶ 56. As far as we can discern from the record, Mr. Neff was supposed to show up for work on January 7, 2001 in the demoted position, but he did not. We do not know why he did not show up for work, but he does not allege a discharge in his complaint nor argue for one in his opposition to summary judgment.

*Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Waldridge,* 24 F.3d at 920.

### C. *Mr. Neff's Federal Claims.*

#### a. *Legal Analysis.*

Mr. Neff's First Amendment speech claim and his political patronage claim are analytically similar. *See Warzon v. Drew,* 60 F.3d 1234, 1238–1239 (7th Cir.1995). Both arise from the same set of events. He alleges that he was suspended and demoted in retaliation for refusing to sign an affidavit which placed blame on the county prosecutor's office. Then, when Mr. Hmurovich spoke to the press about Mr. Neff's job performance, Mr. Neff "was prohibited from responding to those comments." Pl. Opp., p. 9. Mr. Neff argues that his refusal to sign the affidavit angered the officials in power, whose political affiliation was different from his own. Mr. Neff's conspiracy claim requires a different analysis, but one which applies to the same basic set of facts: there he alleges Messrs. Hmurovich and Vaughn conspired to deprive him of his right to free expression and to be free from employment decisions based on his political affiliation.

Since Mr. Neff's section 1983 claims are against Messrs. Hmurovich and Vaughn in their individual capacities, we begin with the analysis appropriate to individual capacity cases. The Seventh Circuit outlined the proof scheme in *McPhaul v. Board of Com'rs of Madison County,* 226 F.3d 558, 566 (7th Cir.2000):

> To establish an individual capacity claim under section 1983 against a supervisory official, there must be a showing that the official was directly responsible for the improper conduct, *Wolf–Lillie v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983), and "knowingly, willfully, or at least recklessly caused the alleged deprivation

by [her] action or failure to act." *Rascon v. Hardiman,* 803 F.2d 269, 274 (7th Cir.1986).

The Court entered the following caveat:

> [A] defendant's direct participation in the deprivation is not required. An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent.

*Id., quoting Smith v. Rowe,* 761 F.2d 360, 369 (7th Cir.1985).

■ In sum, to survive summary judgment in his individual capacity lawsuit, Mr. Neff must present admissible evidence raising an inference that Messrs. Hmurovich and Vaughn were "directly responsible for the improper conduct" and "knowingly, willfully, or at least recklessly caused the alleged deprivation by [their] action or failure to act." *See, Curry v. Pulliam,* 234 F.Supp.2d 921, 927 (S.D.Ind., 2002); *Doan v. Indiana Dept. of Corrections,* 2001 WL 1029115 (S.D.Ind.2001). This standard for individual liability applies to all of Mr. Neff's federal claims.

Although we proceed to an analysis of Mr. Neff's specific claims, we observe at the outset that he has failed to sustain his burden of presenting legally sufficient evidence that either Mr. Hmurovich or Mr. Vaughn was directly responsible for any unlawful conduct or that either knowingly, willfully, or recklessly caused Mr. Neff any deprivation by his action or failure to act.

#### 1. *First Amendment Retaliation.*

■ In sum, Mr. Neff alleges that he was suspended and demoted because he engaged in speech—or a refusal to speak and a coerced silence—that is protected under the First Amendment.[2] As a public

---

**2.** Defendants suggest that Mr. Neff improper-

ly relies on the notion that his refusal to

employee, Mr. Neff's speech is protected under two circumstances: when he speaks on a "matter of public concern"; and, if he does, when his interest in uninhibited speech is not counter-balanced by his employer's interest in preserving a disciplined workplace. This is the well-established two-part test enunciated in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) and *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *See Gonzalez v. City of Chicago*, 239 F.3d 939, 940–41 (7th Cir. 2001). The analysis requires us to determine, first, whether Mr. Neff spoke as a citizen upon a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If so, we next balance Mr. Neff's interest in commenting upon such matters and the employer's interest in efficient public services. *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). See *Wainscott v. Henry*, 315 F.3d 844, 850–852 (7th Cir.2003).

### a. *Policy–Maker.*

Before turning to the *Pickering Connick* analysis, we address a threshold issue raised by the FSSA. It argues that Mr. Neff's speech is not protected because he served as a "policy-maker," thus invoking what the Seventh Circuit has called the "policy-maker corollary to the Pickering analysis." *Vargas Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 970–973 (7th Cir.2001). The question is whether Mr. Neff, as Director of Marshall County's DFC, was a "policy-maker." If he was, his speech may not have been protected; if he was not, we continue the

*Pickering Connick* analysis. *Warzon*, 60 F.3d at 1239.

■ A policy-making employee is one whose position "authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir.1981), quoted in *Vargas–Harrison*, 272 F.3d at 972. We do not make this determination in light of the employee's title; we look to his or her actual job duties and responsibilities.

It is undisputed on the record before us that, as Director of the Marshall County DFC Office, Mr. Neff oversaw eighteen staff members; he had final responsibility for everyone in the office and had authority to hire and fire. Mr. Neff acknowledges that he had "responsibility to investigate cases of abuse and neglect" and "to insure the safety of children once they were in [his] agency." Mr. Neff also prepared budgets and submitted them annually; he administered child welfare services and public assistance programs; he appointed and oversaw child protection teams and prepared child protection plans; he attended court with case workers or family case managers; he was involved in quality control issues; and he developed procedures to implement policy. As Director, Mr. Neff also had significant contact with the public, community leaders, judges, and government officials in carrying out the agency's tasks.

■ We conclude on this unrebutted record that Mr. Neff's job duties were those of a policy-maker for purposes of the

---

speak—that is, to sign the affidavit—and his alleged coerced silence are not proper subjects of First Amendment protection. The Supreme Court has, however, referred to a line of cases involving the protection of compelled or coerced speech as well as coerced

silence. *Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 471 472, 117 S.Ct. 2130, 2139, 138 L.Ed.2d 585 (1997). Both the five member majority and the four dissenters agreed that such speech and non-speech are protected.

*Pickering* analysis. In the absence of any discussion of the policy-maker issue by Mr. Neff, we turn to established case law for analogous situations. Our conclusion that Mr. Neff was a policy maker is bolstered by a Seventh Circuit cases involving the controller of Milwaukee County's Department of Administration and another case involving an elementary school principal. *Warzon*, 60 F.3d at 1235 and *Vargas Harrison*, 272 F.3d at 972, respectively. Although both positions reported to others in a hierarchy and both implemented policies from higher authorities, both also had sufficient oversight and control over their respective entities and sufficient meaningful input into the policy-making process that both were found to be policy makers. Similarly, the public employees in *Ryan v. Illinois Dept. of Children and Family Services*, 185 F.3d 751, 759–760 (7th Cir.1999) were the Regional and Assistant Regional Directors of the Department of Children and Family Services. Both were deemed policy makers.[3]

A public employer may, under certain circumstances, fire a policy maker on the basis of his or her political beliefs. *Ryan v. Illinois Dept. of Children and Family Services*, 185 F.3d 751, 759–760 (7th Cir.1999); *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir.1993). A public employer may fire a policymaking employee for "advocating positions in conflict with … stated policies." *Ryan*, 185 F.3d at 759; *Warzon*, 60 F.3d at 1239; *Wilbur*, 3 F.3d at 217. There is still room for a policy maker to engage in protected speech; where, for example, he or she speaks on issues of a non-political nature. *See, e.g., Bonds v. Milwaukee County*, 207 F.3d 969, 978 (7th Cir.2000). Here, however, Mr. Neff himself has characterized his speech and his refusal to speak as political in nature.

Thus, Mr. Neff claims that, at some unspecified time during his employment, he was directed by Mr. Hmurovich (a Democratic appointee) to lobby on behalf of the (Democratic) governor or be subject to disciplinary action. At some unspecified

---

**3.** Our conclusions is further bolstered by cases collected by the Second Circuit in *Lewis v. Cowen*, 165 F.3d 154, 168 (2nd Cir.1999), in which it enumerated the following decisions with the title of the policy maker in parentheses:

*McEvoy v. Spencer*, 124 F.3d 92, 104 (2d Cir.1997) (police commissioner); *Gordon v. County of Rockland*, 110 F.3d 886 (2d Cir. 1997) (county attorney); *Vezzetti v. Pellegrini*, 22 F.3d 483 (2d Cir.1994) (highway superintendent); *Regan v. Boogertman*, 984 F.2d 577 (2d Cir.1993) (deputy tax receiver); *Savage v. Gorski*, 850 F.2d 64 (2d Cir. 1988) (confidential secretary to director of county correctional facility; coordinator for pre-trial release services; and first deputy service officer for county veterans service agency). Other Circuits have recognized equivalent positions as "policymaking" within the meaning of *Branti and Elrod*. *See, e.g., Flynn v. City of Boston*, 140 F.3d 42 (1st Cir.1998) (associate director of administration and finance and associate director for field operations of city agency);

*Fazio v. City & County of San Francisco*, 125 F.3d 1328 (9th Cir.1997) (assistant district attorney); *Jenkins v. Medford*, 119 F.3d 1156 (4th Cir.1997) (en banc) (deputy sheriff); *Cutcliffe v. Cochran*, 117 F.3d 1353 (11th Cir.1997) (deputy sheriff); *Peters v. Delaware River Port Auth.*, 16 F.3d 1346 (3d Cir.1994) (Secretary of transit authority); *Selch v. Letts*, 5 F.3d 1040 (7th Cir.1993) (subdistrict superintendent of highway department); *Faughender v. City of North Olmsted*, 927 F.2d 909 (6th Cir.1991) (mayor's personal secretary); *Green v. Henley*, 924 F.2d 185 (10th Cir.1991) (administrator of transportation division of state commission); *Bauer v. Bosley*, 802 F.2d 1058 (8th Cir.1986) (staff legal assistant in court clerk's office); *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236 (1st Cir.1986) (regional director of urban development and housing corporation); *Brown v. Trench*, 787 F.2d 167 (3d Cir.1986) (assistant director of public information); *Tomczak v. City of Chicago*, 765 F.2d 633 (7th Cir.1985) (first deputy commissioner of water department).

point during his employment, he was "coerced by Democratic appointee, Steve Vaughn, to attend a political gathering supportive of the incumbent party." Finally, more than once Mr. Hmurovich asked Mr. Neff to make derogatory statements regarding elected officials who were of a different political party than the Governor.

Mr. Neff also claims that Mr. Hmurovich told him to obtain affidavits from his staff which would be used to discredit the County Prosecutor, a member of the opposite political party, in a high-profile case. Mr. Neff refused, believing that providing such affidavits would imply that the County Prosecutor was responsible and at fault and would impair the relationship between the Prosecutor's Office and his own department.

We previously noted that all of Mr. Neff's statements are supported only by his own uncorroborated deposition testimony. For purposes of summary judgment, his own testimony, if rebutted, has no more evidentiary value than his complaint allegations. They are precisely the sort of "conclusory" and "self-serving" testimony that cannot create a triable issue of fact. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354 (7th Cir.2002); *Basith v. Cook County*, 241 F.3d 919, 928 (7th Cir.2001).

Additionally, even if Mr. Neff had offered evidence to support his contentions, we find it difficult to imagine conduct more "political" than an employee in a policy making position being asked to make statements on behalf of the governor and making adherents of the opposite political party look bad. As the Seventh Circuit noted in *Wilbur*, the First Amendment does not require "a public official to hire, or retain, in a confidential or policymaking job, persons who are not his political friends and maybe his political enemies." *Bonds*, 207 F.3d 969, 978, *quoting Wilbur*, 3 F.3d at 218.

We might construe only two of Mr. Neff's allegations as being non-political in nature, and therefore, potentially outside the ambit of the policy-maker exception. The first is that Mr. Neff was "pressured by a representative of the Governor to take a particular action in a high-profile case, which Mr. Neff deemed violative of legal procedure, to protect the Governor and his political party from the heat." The second is that Mr. Hmurovich told him to obtain affidavits from his staff which would be used to discredit the County Prosecutor in a high-profile case. Mr. Neff did not comply because he believed that providing such affidavits would imply that the County Prosecutor was responsible and at fault and would impair the relationship between the Prosecutor's Office and his own department. Mr. Neff has presented legally insufficient evidence in support of either of these possible exceptions.

We conclude that Mr. Neff has offered legally insufficient evidence to raise an inference that his allegations are true. Moreover, even if there were an evidentiary basis for his allegations, we conclude that he was a policy maker and that his speech, and refusal to speak and coerced silence, were political in nature. Accordingly, his speech and refusal to speak were not protected. Defendants are entitled to summary judgment on this basis alone.

As the following discussions make clear, in addition, even if Mr. Neff had not been a policy maker and even if his speech had been protected, there is a legally insufficient basis for concluding that his refusal to speak and his silence in the face of Mr. Hmurovich's comments had anything to do with his suspension and discharge.

b. *Matter of Public Concern and Balancing of Interests.*

 We will cut to the chase by simply assuming—either contrary to the evi-

dence or without evidentiary support—that (a) Mr. Neff was not a policy maker, (b) that he spoke on matters of public concern, and (c) that, on balance, his and the public's interest in his speech was greater than his agency's interest in preserving an efficient and disciplined workplace. We will also assume (d) that Messrs. Hmurovich and Vaughn did not have qualified immunity to take the action they did, namely suspending and demoting Mr. Neff. These assumptions are not implausible. If Mr. Neff had presented any evidence as to these matters, we might readily conclude that he spoke on matters of public concern,[4] that his employer had less of an interest in prohibiting or inhibiting his speech than his in engaging in it,[5] and

that public employees' right to free speech on non-political matters was well established at the time of Mr. Neff's suspension and demotion so that Messrs. Hmurovich and Vaughn are not entitled to qualified immunity.[6]

Nevertheless, even after making these assumptions in Mr. Neff's favor, we conclude that Mr. Neff has not presented legally sufficient evidence to show that his exercise of free speech was in any way related to his suspension and demotion.

■ This is, at bottom, an employment case. It has been well established for more than two decades that, for a public employee to prevail in a retaliation case, he must present evidence that he engaged

---

**4.** In determining whether Mr. Neff's speech and refusal to speak were over matters of public concern we consider "the content, form, and context of a given statement as revealed by the whole record." *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. Of the three elements, content is the most important factor. *Yoggerst v. Hedges,* 739 F.2d 293, 296 (7th Cir.1984). Speech is "directed at a matter of public concern" if it relates to any matter of "political, social, or other concern to the community." *Kuchenreuther v. City of Milwaukee,* 221 F.3d 967, 973 (7th Cir.2000), *quoting Connick,* 461 U.S. at 146, 103 S.Ct. 1684. A matter is not of public concern if it involves a personal grievance of interest only to the employee. *Gustafson v. Jones,* 290 F.3d 895, 907 (7th Cir.2002).

**5.** We consider seven factors in balancing the employee's First Amendment interest against the employer's need to manage the workplace: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform his responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general pub-

lic. *Greer v. Amesqua,* 212 F.3d 358, 371 (7th Cir.2000). The proper balance of these competing interests is a question of law. *Propst v. Bitzer,* 39 F.3d 148, 152 (7th Cir.1994). Although we resolved the second and, implicitly, the third and fifth in favor of the FSSA in our discussion of Mr. Neff as a policy maker, we are assuming for purposes of the following discussion that, on balance, these factors favor Mr. Neff.

**6.** Since the Supreme Court's decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the question of whether a public official is entitled to qualified immunity has involved a two-step inquiry. First, has the plaintiff alleged violation of a Constitutional right. If the answer to the first question is yes, we inquire whether the right was clearly established at the time of the alleged violation. *Hope v. Pelzer,* 536 U.S. 730, 739–740, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002). Given our initial assumptions, Mr. Neff has alleged a violation of his right to free speech pursuant to the First Amendment. As to the second question, "[i]t has been well established for many years in this Circuit that a public employer may not retaliate against an employee who exercises his First Amendment speech rights." *Gustafson v. Jones,* 117 F.3d 1015, 1021 (7th Cir.1997); also see *Mitchell v. Randolph,* 215 F.3d 753, 757–758 (7th Cir.2000). Accordingly, in view of our assumptions, Messrs. Hmurovich and Vaughn would not have had immunity.

in protected speech and that his doing so was a substantial or motivating factor in the adverse action taken against him. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Thus, to survive the FSSA's motion for summary judgment, Mr. Neff must present admissible evidence either that there is a substantial connection between his engaging in protected speech and his suspension and demotion, or that the FSSA's explanation as to why it took its adverse action against him is a pretext for retaliation. *Roberts v. Broski,* 186 F.3d 990, 995 (7th Cir.1999), *citing Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (where a party bears the burden of persuasion on an issue, he "is obliged to identify evidence that would permit a jury to find in his favor."). A plaintiff's subjective belief that he was the victim of retaliation along with his conclusory allegation to that effect is simply insufficient to raise a genuine issue of material fact. *Roberts v. Broski,* 186 F.3d 990, 995 (7th Cir.1999); *Vukadinovich v. Bd. Of Sch. Tr. Of N. Newton Sch. Corp.,* 278 F.3d 693, 699 (7th Cir.2002); *Kuchenreuther v. City of Milwaukee, Wis.,* 221 F.3d 967, 976 (7th Cir.2000); *Johnson v. Univ. of Wisconsin–Eau Claire,* 70 F.3d 469, 480 (7th Cir.1995).

Mr. Neff has produced no evidence beyond his subjective belief, stated in the form of conclusory deposition testimony, that there is any connection between his engaging in protected speech and his suspension and demotion. He argues, in effect, that since he and Mr. Hmurovich do not share similar political beliefs, then Mr. Hmurovich must have been motivated by a desire to quiet Mr. Neff when he suspended and demoted him. That subjective belief is insufficient to support a claim of retaliation.

Nor has Mr. Neff shown that the FSSA's explanation of why it took its ad-

verse action was a pretext for retaliation. To the contrary, faced with the FSSA's well-documented presentation of all of the factors that went into the suspension and demotion decisions—including quality control review and a pre-deprivation hearing—Mr. Neff has remained essentially mute. As we noted earlier, we are obliged to accept as true facts that are supported by admissible evidence and unchallenged by the opposing party. We must, therefore, accept the FSSA's well-documented rationale for suspending and demoting Mr. Neff.

We also remind plaintiff of the standard he must meet in order to prove an individual capacity case. He must present evidence raising a reasonable inference that Messrs. Hmurovich and Vaughn were "directly responsible for the improper conduct" and "knowingly, willfully, or at least recklessly caused the alleged deprivation by [their] action or failure to act."

Even if Mr. Neff were not a policymaker, he has presented legally insufficient evidence that his engaging in protected speech was a motivating reason for his suspension and demotion, much less that Mr. Hmurovich and/or Mr. Vaughn was directly responsible for a deprivation of his rights and knowingly, wilfully or recklessly caused it. Accordingly, we GRANT FSSA's motion for summary judgment on Mr. Neff's free speech claim.

2. *Retaliation Based on Political Affiliation.*

Our analysis of Mr. Neff's political affiliation claim is substantially identical to our analysis of his free speech claim. Adverse employment action taken on the basis of political affiliation is governed by the long line of cases beginning with *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d

574 (1980), and later clarified in *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Also see, *Warzon v. Drew*, 60 F.3d 1234, 1238–1239 (7th Cir.1995);[7] *Wilbur v. Mahan*, 3 F.3d 214, 215 (7th Cir.1993).

In *Nelms v. Modisett*, 153 F.3d 815, 818 (7th Cir.1998), the Seventh Circuit outlined the prima facie case for politically-motivated retaliation. At the summary judgment level, the plaintiff must present evidence raising a reasonable inference "that his conduct was constitutionally protected, and that the protected conduct was a substantial factor in the decision to terminate him." *Quoting Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir.1992). "That burden," wrote the court, "is not insignificant." *Nelms*, 153 F.3d at 818. In words that bear more than passing pertinence to the instant case, the Seventh Circuit continued:

> "A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir.1981), *certiorari denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 139. If [the plaintiff] is able to demonstrate that his political affiliation was a motivating factor in his termination, the burden then shifts to defendants to prove by a preponderance of the evidence that they had a legitimate, non-political reason for terminating him in order to avoid liability. *Garrett*, 961 F.2d at 632.

Mr. Neff's claim rests on the shaky foundation that he was suspended and de-

moted because Mr. Hmurovich is a Democrat and he, impliedly, is not. (Although Mr. Neff refers to Mr. Hmurovich as a Democrat, he nowhere informs us of his own party affiliation.)

The FSSA argues that Mr. Neff was a "policy maker" for purposes of his political affiliation claim. Although the definition of "policy maker" for purposes of political affiliation cases differs subtly from the definition for purposes of free speech cases, we conclude that Mr. Neff was a policy maker for purposes of his political affiliation claim for the same reasons that we did for purposes of his free speech claim. *See, Thompson v. Illinois Dept. of Professional Regulation*, 300 F.3d 750, 755–758 (7th Cir.2002) ("the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Quoting Branti*, 445 U.S. at 517–18, 100 S.Ct. 1287).

Once again, however, we cut to the chase by assuming that Mr. Neff was not a policy maker. We conclude that, even if Mr. Neff did not occupy a confidential or policymaking position in which party loyalty was a necessary attribute of the occupant, Mr. Neff's political affiliation claim suffers from the same lack of evidence as his free speech claim: he has presented legally insufficient evidence that his political affiliation had anything to do with his suspension and demotion.

Mr. Neff provides no evidence other than his own uncorroborated asser-

---

**7.** The Seventh Circuit noted in *Warzon* that, while the analysis of free speech and political affiliation cases is very similar, they are "distinct" "In the patronage cases, we are concerned primarily with elected officials' ability to execute their policies—to which the polity provided its imprimatur on election day—without the hindrance of political antagonists doing their bidding. In the typical Pickering case, on the other hand, we are more concerned with the efficiency of the agency." 60 F.3d at 1239.

tions that he was suspended and demoted for political reasons. Although defendants offer rebuttal to some of the following allegations,[8] we will assume that these allegations are true for purposes of our analysis. We recite only *factual* allegations without Mr. Neff's self-serving conclusions.

> The defendant, James Hmurovich, instructed employees of FSSA, formerly supervised by plaintiff, to prepare affidavits indicating they had demanded information from the Marshall County Prosecutor's Office related to the early release of a criminal convict.... The defendant required political meetings of plaintiff and state officials, and required plaintiff to lobby for state employees. The plaintiff is a merit based employee not appointed by the Governor. Members of plaintiff's office were directed to visit with the Governor. Defendant refused to approve plaintiff's budgets....

Pl. Opp Brief, pp. 11–12. Mr. Neff concludes from these facts that: "Based upon plaintiff's failure to fully cooperate with these political pressures he was subject to adverse employment decisions." *Id.*

Even assuming that all of the *factual* statements are true, we need not reach Mr. Neff's desired conclusion. To the contrary, no jury could reasonably infer from them that Mr. Hmurovich suspended and demoted Mr. Neff *because of* Mr. Neff's political affiliation. Mr. Neff has presented legally insufficient evidence to raise a reasonable inference that his political affiliation was a motivating factor in his termination. In other words, he has presented insufficient evidence even to shift the burden to the defendants to show that they had a legitimate, non-political reason for

terminating him in order to avoid liability. *Nelms,* 153 F.3d at 818.

But, once again, even if Mr. Neff's evidence were sufficient to shift the burden to the defendants to show that they had a legitimate, non-retaliatory motive for suspending and demoting him, the defendants have produced abundant evidence to support that position. Mr. Neff's failure to challenge defendants' stated reasons for suspending and demoting him—which are well documented and provide a satisfactory basis for suspension and demotion—is fatal to his case.

Indeed, Mr. Neff simply assumes, without providing evidence, that Mr. Hmurovich even knew his party affiliation. Mr. Hmurovich denies that he did. Hmurovich Decl. ¶ 30. So does Mr. Vaughn. Vaughn Decl. ¶ 27. In *Cusson–Cobb v. O'Lessker,* 953 F.2d 1079, 1081 (7th Cir.1992), the Seventh Circuit held that the plaintiff needed to show that the defendant knew of her political affiliation in order to prove that her political affiliation was a motivating factor in her discharge. Additionally, as an evidentiary matter, when faced with an *absence* of evidence on the one hand and *positive testimony* on the other, we are constrained to accept the positive declaration. *See, Tinder v. Pinkerton Security,* 305 F.3d 728, 735–736 (7th Cir.2002); *Unterreiner v. Volkswagen of America, Inc.,* 8 F.3d 1206, 1211 (7th Cir.1993).

We also note in passing that Mr. Neff does not help his case for retaliation by acknowledging that he received "a two-step promotion in his job" on March 28, 2000. Pl. Opp., p. 2. We intuitively construe "a two-step promotion" to be a sig-

---

**8.** Mr. Vaughn states that Mr. Neff and other County Directors "were to inform and educate the public, community, including legislators, regarding child welfare services. Mr. Neff was not mandated to participate in any political activities." Vaughn Decl. ¶ 28. He also asserts that Mr. Neff, along with other County Directors, were invited to attend a reception hosted by. *Mrs.* O'Bannon at the Governor's residence and that those Directors chose not to attend suffered no job detriment. Vaughn Decl. ¶ 29.

nificant one, apparently reflecting confidence in Mr. Neff's job performance and prospects. It follows that such an admission is inconsistent with the allegation that Mr. Hmurovich retaliated against him because he was affiliated with the wrong political party, and that at least one incident leading to the retaliation (the required affidavit incident) occurred in "March 2000."

We remind the plaintiff that his burden in an individual capacity case was to present evidence that the defendants were "directly responsible" for improperly suspending and demoting him and that they did so "knowingly, willfully, or at least recklessly." *McPhaul*, 226 F.3d at 566. This he has failed to do.

Accordingly, we GRANT defendants' motion for summary judgment as to Mr. Neff's political affiliation claim.

### 3. *Conspiracy to Deprive Mr. Neff of a Protected Right.*

The parties address plaintiff's conspiracy claim as if it were subject to dismissal pursuant to Rule 12(b)(6) or 12(c). Defendants argue that Mr. Neff's complaint fails to plead a conspiracy claim adequately; Mr. Neff asserts that it does. Because the evidentiary record is extensive, however, we bypass the question of whether the claim was adequately pled. We assume that it was properly pled pursuant to either section 1983 or section 1985(3)[9] and treat defendants' motion as one for summary judgment. *Tierney v. Vahle*, 304 F.3d 734, 737 (7th Cir.2002); *Walker v.*

*Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002).

Additionally, defendants argue that, even if everything Mr. Neff alleges about a conspiracy were true, their actions were shielded by the intra-corporate conspiracy doctrine. We are inclined to agree for reasons set forth in *Salto v. Mercado*, 1997 WL 222874 (N.D.Ill.1997), *1, where Judge Zagel shows that the intra-corporate shield applies particularly well, as in the instant case, in the employment setting. Nevertheless, once again we will assume that Messrs. Hmurovich and Vaughn were not protected from liability for conspiracy and, as we did with respect to Mr. Neff's other federal claims, we proceed to the question of causation.

The Supreme Court has held that, in order to prevail in a section 1985(3) claim, the plaintiff must establish that "some racial, or perhaps otherwise class-based, invidiously discriminatory animus [lay] behind the conspirators' action," and that "the conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as official, encroachment.'" *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–268, 113 S.Ct. 753, 758, 122 L.Ed.2d 34 (1993) (internal citations omitted). The Seventh Circuit interpreted these requirements in *Indianapolis Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743, 754 (7th Cir.1999) to require a showing of four elements:

(1) a conspiracy;

(2) a purpose of depriving, either directly or indirectly, any person or class of

---

9. Section 1985(3), a section of the Ku Klux Klan Act, *Bray*, 506 U.S. at 263, 113 S.Ct. at 767, prohibits conspiracies between and among private individuals under certain circumstances. It provides in pertinent part: "If two or more persons in any State or Territory conspire ... for the purpose of depriving ... any person or class of persons of the equal protection of the laws ...

whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. § 1985(3).

persons of the equal protection of the laws, or of equal privileges and immunities under the laws;

(3) an act in furtherance of the conspiracy; and

(4) an injury to his person or property or a deprivation of any right or privilege of a citizen of the United States.

*Citing, Trautvetter v. Quick,* 916 F.2d 1140, 1153 (7th Cir.1990). Significantly, the Seventh Circuit added that, *"[a]s a threshold matter* we note that the absence of any underlying violation of the plaintiffs' rights precludes the possibility of their succeeding on this conspiracy count". *Id.* (emphasis added). *Also see, Green v. Benden,* 281 F.3d 661, 665–666 (7th Cir.2002).

For purposes of Mr. Neff's conspiracy claim, the requirements of a section 1983 conspiracy claim are all but identical. In *Scherer v. Balkema,* 840 F.2d 437, 441 (7th Cir.1988), the Seventh Circuit explained that a conspiracy under section 1983 is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." To establish a prima facie case of civil conspiracy, Mr. Neff must show not only "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights," but also the *"actual deprivations of those rights in the form of overt acts in furtherance of the agreement." Id.* at 442. (Emphasis added.)

Mr. Neff has presented legally insufficient evidence of any of these elements. He has not presented evidence that Messrs. Hmurovich and Vaughn had an unlawful motive in suspending and demoting him, or that they used unlawful means toward a lawful end. Perhaps most important, since we have already found

that Hmurovich and Vaughn did not violate Mr. Neff's First Amendment rights by suspending and demoting him, it follows that whatever agreement Messrs. Hmurovich and Vaughn may have come to was not one that led to an injury cognizable by either section 1983 or 1985(3). In other words, a jury could not reasonably find that Messrs. Hmurovich and Vaughn violated Mr. Neff's rights so that it could not reasonably find that they conspired to do so.

### D. *Mr. Neff's State Law Claims.*

Mr. Neff insists that he may try his state law claims against both Messrs. Hmurovich and Vaughn in their individual capacities *and* against the state pursuant to our pendent jurisdiction. 28 U.S.C. § 1367. Pl. Opp. p. 8. He asserts, not without reason, that it would be inefficient to require him to try factually-identical cases in state and federal court. He reasons that, since his claims against the State are "factually identical" to his claims against Messrs. Hmurovich and Vaughn, and since we have original jurisdiction over Messrs. Hmurovich and Vaughn in their individual capacities, we ought to exercise pendent jurisdiction on his claims against the State as well.

There is at least one alternative to Mr. Neff's suggestion that we exercise pendent jurisdiction over *all* of his state claims and that is that we exercise pendent jurisdiction over *none* of his state claims, so that he may prosecute them in state court all together. There are two sound reasons for adopting this alternative.

First, in *City of Chicago v. International College of Surgeons,* 522 U.S. 156, 172–173, 118 S.Ct. 523, 533–534, 139 L.Ed.2d 525 (1997), the Supreme Court observed that "pendent jurisdiction 'is a doctrine of discretion, not of plaintiff's right.'" (Internal citation omitted.) We have discre-

tion to decline to exercise pendent claims under certain circumstances as outlined in section 1367(c). These circumstances include when:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). Subsections (3) and (4) apply here. As to subsection 3, we have dismissed all of Mr. Neff's federal claims on defendants' motion for summary judgment so that declining jurisdiction over his pendent claims is proper.

As to section 1367(c)(4) "exceptional circumstances," the Supreme Court has made clear that we have no more jurisdiction over Mr. Neff's claims against the state pursuant to our *pendent* jurisdiction than we did under our *original* jurisdiction. Sovereign immunity simply deprives us of jurisdiction to hear claims against a non-consenting state, and jurisdiction cannot be created through the back door.

In sum ... neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment. We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment.... We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction.

*Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 120, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984). We understand this to be an "exceptional circumstance" under section 1367(c)(4).

While we could exercise pendent jurisdiction over Mr. Neff's state law claims against the *individual* defendants (as we have exercised original jurisdiction over them in their individual capacities), we may not exercise it with respect to his claims against *the State*. We agree with Mr. Neff that his claims against the individuals and against the State are factually identical, so that if we exercised pendent jurisdiction over only the individual claims we would, in effect, be dealing with the tail but not the rest of the dog. Accordingly, we DISMISS Mr. Neff's state law claims as to all defendants WITHOUT PREJUDICE so that he may pursue them, if he chooses, all together in state court. *See, O'Grady v. Village of Libertyville,* 304 F.3d 719, 725 (7th Cir.2002) (affirmed dismissal of pendent claims without prejudice after federal claims were dismissed); *Van Harken v. City of Chicago,* 103 F.3d 1346, 1354 (7th Cir.1997) ("[W]e acknowledge the broad discretion of district judges in making judgments concerning the retention of supplemental claims.").

### IV. *Conclusion.*

For the reasons addressed, we GRANT defendants' motion for summary judgment on all three of Mr. Neff's federal claims; these claims we DISMISS WITH PREJUDICE. We decline to exercise jurisdiction over Mr. Neff's state claims; these claims we DISMISS WITHOUT PREJUDICE.